**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-01380-NYW-SKC

INTERSTATE RESTORATION, LLC,

     Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC., and
ZURICH AMERICAN INSURANCE CO.,

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on (1) Defendant Zurich American Insurance Co.'s Motion for Summary Judgment ("Zurich America's Motion"), [Doc. 59, filed June 17, 2022]; and (2) Defendant Marriott International, Inc.'s Motion for Summary Judgment ("Marriott's Motion" and, collectively, the "Motions for Summary Judgment" or "Motions"), [Doc. 63, filed July 1, 2022].  Upon review of the record, and for the reasons set forth herein, the Court respectfully **DENIES** the Motions for Summary Judgment.

### BACKGROUND[1]

#### I.    Factual Background

This case arises from property damage caused by a mudslide at the Sheraton Grand Rio Hotel & Resort, a "Marriott-branded" hotel in Rio de Janeiro, Brazil ("Sheraton" or the "Hotel"), and the subsequent repairs performed by Plaintiff Interstate Restoration, LLC ("Interstate" or

---

[1] Unless otherwise indicated, the Court draws the following facts from the Amended Complaint, [Doc. 32], and provides them here solely as background, not as undisputed factual assertions.

"Plaintiff"), which claims that it has not been paid in full for its work.  For support, Interstate alleges that in early February 2019, Defendant Marriott International, Inc.'s ("Marriott") Senior Vice President for Risk Management, Hector Mastrapa ("Mr. Mastrapa"), called Interstate and requested that it conduct an urgent repair project at the Sheraton.  [Doc. 32 at ¶ 10].  Interstate agreed to perform the repairs.  [*Id.* at ¶¶ 12, 14].

*The Advanced Work Order.*  Interstate alleges that it and Marriott "memorialized the terms" of the phone call with Mr. Mastrapa by entering an Advanced Work Order ("AWO"), which "set forth the general terms of the parties' relationship and the scope of work to be performed." [*Id.* at ¶¶ 22, 25].  Sintia Gomes ("Ms. Gomes"), the manager of the Sheraton, signed the AWO. [*Id.* at ¶ 23].  Interstate claims that it "understood Gomes to be an employee and agent of Marriott . . . and further understood that she was executing the [AWO] on behalf of Marriott."  [*Id.* at ¶ 24]. Interstate later supplemented the terms of the AWO with "scope letters" that detailed the work Interstate would perform for each part of the repair project.  [*Id.* at ¶ 25].  Interstate also executed four additional agreements—the "National Agreement Work Orders" ("NAWO Nos. 1, 2, 3 and 4," respectively)—covering various aspects of repairs at the Hotel.  *See* [Doc. 64-4; Doc. 64-5; Doc. 64-6; Doc. 64-8].

*Zurich American Insurance Company.*  Around the time that Interstate executed the AWO, Marriott filed an insurance claim with its insurance carrier, Defendant Zurich American Insurance Co. ("Zurich America"), "under its property damage policy."  [Doc. 32 at ¶ 15]. Interstate claims that "Marriott intended to use insurance proceeds from the Zurich insurance policy to pay amounts owed for Interstate's work."  [*Id.* at ¶ 17].

After completing its work, Interstate issued invoices to Marriott and/or the Hotel that totaled approximately $7.2 million.  [*Id.* at ¶¶ 59–65].  However, Interstate alleges that Zurich

America "instructed Marriott to refrain from paying the full value of Interstate's invoices, contending that Marriott should pay Interstate based not on the agreed-upon Rate Schedule but on different [lower] rates, to which the parties never agreed." [*Id.* at ¶¶ 69–70]. According to Interstate, Zurich made this advisement based on information from Critério Experts ("Critério"), a "claim consultant" whom Interstate alleges "Zurich retained . . . to adjust the claim on Zurich's behalf." [*Id.* at ¶¶ 18, 69].

Interstate thus filed suit against Marriott and Zurich America (collectively, "Defendants"), asserting three claims for relief: (1) breach of contract against Marriott (Count I); (2) intentional interference with contract against Zurich America (Count II); and (3) unjust enrichment against Marriott (Count III). *See* [*id.* at ¶¶ 73–92]. For its breach of contract claim, Interstate alleges that it performed its obligations under the repair contract by completing the work set forth in the AWO and the scope letters, and "Marriott has breached the Contract by failing to pay Interstate's invoices as they came due." [*Id.* at ¶¶ 76–77]. For its intentional interference with contract claim, Interstate claims that "Zurich improperly interfered with Marriott's performance of its obligations under the Contract through its agent, Critério," which "instructed Marriott to refrain from paying Interstate's invoices in full, based on the contention that Marriott should pay Interstate based on different rates, to which the parties never agreed." [*Id.* at ¶¶ 83–84]. This "improper conduct" thus "caused Marriott to breach its Contract with Interstate." [*Id.* at ¶ 85]. Finally, for its unjust enrichment claim, Interstate alleges that it "has been harmed by Marriott's failure to pay for the benefits it received from Interstate in the form of services, and it would be unjust for Marriott to retain those benefits without paying for them." [*Id.* at ¶ 91]. Interstate seeks relief under this claim "[a]s an alternative" to its breach of contract claim. [*Id.* at ¶ 92].

## II.     Procedural History

Interstate initiated this action on April 23, 2021, by filing a Complaint in the District Court for the City and County of Denver, Colorado.  [Doc. 5].  On May 20, 2021, Zurich America removed the case to the United States District Court for the District of Colorado based on diversity jurisdiction.  [Doc. 1].  Interstate filed the operative Amended Complaint and Jury Demand ("Amended Complaint") on August 31, 2021.  [Doc. 32].  Defendants filed their answers on September 14, 2021.  [Doc. 36; Doc. 37].[2]  Following the close of discovery, Defendants filed the instant Motions for Summary Judgment.  [Doc. 59; Doc. 63].  The Motions are fully briefed and are thus ripe for disposition.  *See* [Doc. 67; Doc. 68; Doc. 69; Doc. 70; Doc. 72; Doc. 73].

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  At all times, the Court will "view the factual record and draw all reasonable

---

[2] Marriott also asserted cross claims against Zurich America.  *See* [Doc. 14 at 9–11]; *see also* [Doc. 18].  The Court ultimately dismissed those claims following Defendants' joint request seeking such relief.  *See* [Doc. 56; Doc. 74].

inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## ANALYSIS

The Court will first address Marriott's Motion, [Doc. 63], and then turn to Zurich America's Motion, [Doc. 59].

## I.     Marriott's Motion for Summary Judgment

Marriott seeks summary judgment against Interstate as to both claims against it—breach of contract (Count I) and unjust enrichment (Count III).   Marriott advances six arguments in support of its Motion.   First, Marriott argues that it "could not have breached the AWO because that agreement is with the Hotel's *owner*, and [Marriott] does not own the Hotel."   [Doc. 63 at 13 (emphasis added)].   Second, Marriott contends that Interstate's "claim for an oral contract fails for indefiniteness."   [*Id.* at 14].[3]   Third, Marriott states that, similar to its first argument, it could not have breached the National Agreement Work Orders because it was not a party to those agreements.   [*Id.* at 15].   Fourth, Marriott contends that it "did not breach the Phase 2 agreement"[4] because, again, it was not a party to such an agreement.   [*Id.* at 18].   Fifth, Marriott insists that, even if it had contracted with Interstate to perform the repairs, the breach of contract claim fails because Interstate cannot establish that Marriott agreed to Interstate's rates.   [*Id.* at 19–20].   Finally, Marriott asserts that Interstate's unjust enrichment claim fails because it did not receive a benefit from Interstate's repairs, and in any event, Interstate has already been paid for its work. [*Id.* at 21].

### A.     Undisputed Material Facts

***Marriott, the Sheraton, and the Marriott Property Insurance Program***

1.     Marriott's   business   includes   operating,   franchising,   and   licensing   lodging,

---

[3] The "oral contract" referenced here is the initial telephone call between Mr. Mastrapa at Marriott and Mr. Conrad at Interstate.   The Parties do not dispute that the telephone call occurred, but do dispute the content of such discussion and its legal significance.

[4] The "Phase 2 Agreement," according to Marriott, is comprised of NAWO No. 4 and a Remediation and Restoration Contract, discussed further below, which was intended to cover "Phase 2 of water damage repairs" at the Hotel.   *See* [Doc. 63 at ¶ 11]; *see also* [Doc. 63-12 at 1–11].

including hotels and residential properties.  Marriott does its business directly and through many different subsidiaries.  [Doc. 63 at ¶ 1; Doc. 69 at ¶ 1; Doc. 63-13 at ¶ 2].[5]

2.      Marriott owns 30 brands of hotels, and there are over 8,000 hotels worldwide that bear one of these brands ("Marriott-branded" hotel), including the Sheraton that is the subject of this case.  [Doc. 63-13 at ¶ 4; Doc. 63 at ¶ 2; Doc. 69 at ¶ 2].

3.      All owners of Marriott-branded hotels must carry insurance.  Owners can purchase insurance themselves, or certain owners can obtain insurance through a property insurance program that Marriott offers to owners.  Around 350 to 400 hotels, including the Sheraton, participate in Marriott's property insurance program, "with Zurich as the fronting carrier" under the program.  [Doc. 63-13 at ¶ 6; Doc. 63-14 at 238:15–240:18; Doc. 63 at ¶¶ 3, 7; Doc. 69 at ¶¶ 3, 7].[6]

4.      The Sheraton was insured by policies from Zurich America and non-party Zurich Minas Brasil Seguros S.A. ("Zurich Brazil").[7]  [Doc. 59-6; Doc. 59-13 at 108:2–25; Doc. 59 at ¶ 4; Doc. 67 at ¶ 4].

---

[5] Interstate disputes Marriott's statements describing its business on the basis that Marriott did not address whether it "owns" any hotels and residential properties.  *See* [Doc. 69 at ¶ 1].  However, Interstate does not dispute that Marriott "operates, franchises, and licenses lodging, including hotels and residential," or that Marriott "does its business directly and through many different subsidiaries."  [Doc. 63 at ¶ 1].  Accordingly, the Court deems these facts, as restated herein, to be undisputed.

[6] When citing a deposition transcript, the Court will refer to the page and line numbers in the deposition transcript.

[7] Marriott asserts that the Hotel was insured by Zurich America "and its Brazilian affiliate ('Zurich Brazil')."  [Doc. 63 at 1].  However, Marriott makes this statement in its introduction, not under its statement of "facts," and Interstate thus does not respond to it.  Nevertheless, in its Response to Zurich America's Motion, Interstate contends that "there are indeed two policies relevant to the loss—a local policy issued by Zurich [Brazil] . . . and a master policy issued by Zurich [America]." [Doc. 67 at ¶ 4].  Accordingly, the Court deems this fact undisputed.

5.      Marriott's Senior Vice President for Risk Management is Mr. Mastrapa.  [Doc. 63-14 at 9:14–16].

***Interstate's Business and History with the Marriott Property Insurance Program***

6.      Interstate, an emergency response and restoration reconstruction company, is one of the preferred vendors for Marriott in its property insurance program, and was also on the preferred vendor list with Zurich America.  [Doc. 63 at ¶ 5; Doc. 69 at ¶ 5; Doc. 63-18 at 213:16–214:3].

7.      Brett Conrad ("Mr. Conrad"), a Vice President at Interstate, developed the relationship with Marriott and won the "Marriott account" in 2004, when he worked for another company.  [Doc. 63-16 at  10:22–11:12].  When Mr. Conrad began working at Interstate in 2010, he took the Marriott account with him.  [*Id.* at 8:3–9, 10:22–25; Doc. 63 at ¶ 5; Doc. 69 at ¶ 5].

***The Initial Phone Call Between Marriott and Interstate***

8.      In early February 2019, a mudslide caused millions of dollars' worth of damage at the Sheraton.  [Doc. 63 at ¶ 7; Doc. 69 at ¶ 7].

9.      On February 8, 2019, Mr. Mastrapa at Marriott called Mr. Conrad at Interstate, to see whether Interstate "had capabilities to deploy resources" to handle the loss at the Sheraton, and Mr. Conrad confirmed that Interstate did.  [Doc. 63-14 at 30:25–31:15, 34:13–16; Doc. 63-16 at 20:21–24; Doc. 63 at ¶ 7; Doc. 69 at ¶ 7].  Mr. Mastrapa also requested that Interstate mobilize a team to Brazil as soon as possible, which Interstate agreed to do.  [Doc. 69 at ¶ 12; Doc. 73 at ¶ 12].[8]

---

[8] When citing paragraph numbers in Marriott's Reply, [Doc. 73], the Court is referring to the chart that Marriott prepared wherein it copies verbatim the "facts" from its opening brief, Interstate's responses to each of those statements in its Response, and then provides Marriott's reply to each

### The *"Advanced Work Order Agreement Between Interstate and Owner"*

10.     The same day of the phone call between Messrs. Conrad and Mastrapa, Mr. Conrad emailed Mr. Mastrapa the AWO (i.e., the "Advanced Work Order Between Interstate and Owner"). [Doc. 63-4; Doc. 63-5].

11.     Upon receipt of the AWO, Mr. Mastrapa forwarded the document to other employees within Marriott, requesting that they "[p]lease have the hotel [general manager] or [director of finance] sign the attached contract and return to me so I can forward to the restoration company." [Doc. 63-4 at 1]. Mr. Mastrapa also stated that "[t]hese expenses will be covered by the insurance policy." [*Id.*].

12.     Ms. Gomes was the general manager at the Sheraton. [Doc. 63-14 at 57:18–23]. Ms. Gomes was employed by a Brazilian entity called Companhia Palmares Hoteis e Turismo S.A. ("Companhia"). [Doc. 63-13 at ¶ 7; Doc. 63 at ¶ 14; Doc. 69 at ¶ 14].

13.     The AWO states that "'Owner hereby authorizes Interstate Restoration, LLC . . . to mobilize, commence and perform" the repairs at the Hotel. [Doc. 63-5 at 1].

14.     The "Project Name" in the AWO is "Sheraton Grand Rio Hotel & Resort," and the work description is described as including "[m]itigation, [d]rying and cleanup of affected areas" at the Hotel. [*Id.*].

15.     With respect to payment, the AWO refers to the "Interstate Time and Materials Rate Schedule," which was purportedly attached as "Attachment B." [*Id.*]. The AWO provides that:

of the same. The chart is included at pages 10 through 20 of Marriott's Reply. *See* [*id.* at 10–20]. The Court notes, however, that Marriott's chart omits "fact" no. 14. [*Id.* at 14].

> Owner agrees to pay, *whether or not such Work is covered by insurance*, Interstate
> for all labor, materials, and equipment utilized to perform the Work . . .

[*Id.* (emphasis added)].

16.     Mr. Conrad signed the AWO under "Interstate Restoration, LLC" and Ms. Gomes

signed under the term "Owner."  [*Id.*].

17.     By signing the AWO, Ms. Gomes agreed that she:

> represent(s) and warrant(s) to Interstate that he/she: (i.) is the person properly
> authorized to enter into this Advanced Work Order; (ii.) is doing so on behalf of *all
> owners* of the Property/Project; (iii.) will communicate the contents of this
> Advanced Work Order, including representations made herein, to all owners of the
> Property and, by allowing Interstate to proceed with the Work, all owners hereby
> ratify this Advanced Work Order and terms contained herein.

[*Id.* (emphasis added)].

18.     The AWO does not define the term "Owner," nor does it reference Companhia.  *See
generally* [*id.*].

### The National Agreement Work Orders

19.     Between February 26, 2019 and April 18, 2019, Interstate executed NAWO Nos.
1, 2, 3 and 4 (i.e., the National Agreement Work Orders) covering various aspects of repairs at the

Hotel, with NAWO No. 4 covering the "[c]omplet[ion] of all final [r]epairs of affected areas from

storm damage."  [Doc. 64-4; Doc. 64-5; Doc. 64-6; Doc. 64-8].

20.     Interstate's Project Director, Ryan Porterfield ("Mr. Porterfield"), filled out each of

the NAWOs and presented them to Ms. Gomes at the Hotel.  [Doc. 63-20 at 184:18–186:11].

21.     Each NAWO is between "Interstate Restoration, LLC" and "Client/Owner," but the

term "Client/Owner" is not defined in any of those documents.  [Doc. 64-4; Doc. 64-5; Doc. 64-

6; Doc. 64-8].

22.     The "Project Name and Location" sections of the NAWOs state "Marriott Int'l"

along with the address of the Sheraton, and the "Company Name" in each NAWO is identified as

"Marriott International."  [Doc. 64-4; Doc. 64-5; Doc. 64-6; Doc. 64-8].  Mr. Porterfield testified

that he wrote in these references to Marriott International because he understood from Mr. Conrad

that Marriott International was the client.  [Doc. 63-20 at 184:18–17].

23.    Mr. Porterfield signed each NAWO under "Interstate Restoration, LLC," and Ms.

Gomes signed under "Client/Owner."  [Doc. 64-4; Doc. 64-5; Doc. 64-6; Doc. 64-8].

24.    With respect to payment, the NAWOs state that "Client agrees to make payment to

Interstate per the payment terms outline[d] in the National Account Agreement."  In addition, each

NAWO contains a check mark in a checkbox next to the terms "T & M (Based on INTERSTATE'S

T&M Rate Schedule per the Agreement)."  [Doc. 64-4; Doc. 64-5; Doc. 64-6; Doc. 64-8].

### *The Remediation and Restoration Contract*

25.    On October 15, 2019, Interstate and Companhia executed a Remediation and

Restoration Contract ("RRC"), which was intended to cover "Phase 2 of water damage repairs" at

the Hotel.  [Doc. 63-12 at 1–11].  The RRC contains an integration clause, which states in relevant

part that:

> The Contract represents the entire and integrated agreement between the parties
> hereto and supersedes . . . all prior negotiations, representations or agreements,
> either written or oral . . . , all of which are hereby rendered null and void and of no
> effect. . . .  This Contract is intended to and shall govern all Work provided by
> Contractor for the Project, whether initiated or performed prior or subsequent to the
> execution of this Contract, and the effective date of this Contract shall be deemed
> to be the first date when any such Work was so provided by Contractor.

[*Id.* at 7].

26.    The RRC was signed by Mr. Porterfield on behalf of Interstate and an individual

named Veronica Nogueira on behalf of Companhia.  [*Id.* at 11].

27.    Ultimately, however, Interstate was not hired to complete the Phase 2 repairs under

the RRC.  [Doc. 69-5 at 95:2–7; Doc. 69 at ¶ 20; Doc. 73 at 6 (acknowledging it is "[t]rue" that

"Interstate ultimately was not hired to complete" those repairs)].

### *Interstate's Invoices and Subsequent Disputes*

28.     Interstate's invoices for its work, dated between February 19, 2019 and August 26, 2019, totaled approximately $7.2 million.  *See* [Doc. 63-10; Doc. 63-11; Doc. 63-24; Doc. 64-7; Doc. 64-10; Doc. 64-11].

29.     At some point after the mudslide, Marriott informed Zurich America about the loss at the Hotel.  *See, e.g.*, [Doc. 67-9 at 28–29]; *see generally* [Doc. 63; Doc. 69].

30.     Zurich America and/or Zurich Brazil retained a "building consultant," Critério,[9] to determine whether the amounts of Interstate's invoices were appropriate.  [Doc. 63 at ¶ 22; Doc. 69 at ¶ 22; Doc. 73 at ¶ 22; Doc. 63-18 at 151:1–18].

31.     Critério advised Zurich Brazil to not pay Interstate in full, as the invoices were far above market value for Interstate's work.  Specifically, of the approximately $7.2 million that Interstate invoiced, Critério calculated the value of Interstate's labor under Brazilian rates at approximately $1.6 million.  *See* [Doc. 63-3 at 1].  Critério's chief concern centered on Interstate's markup for two categories in the invoices: (1) local Brazilian laborers and (2) vendors and subcontractors.  [*Id.* at 1–2]; *see also* [Doc. 63 at ¶ 22; Doc. 69 at ¶ 22].

32.     Regarding the local laborers, Interstate's invoices charged two different "blended" hourly rates: $34.00 for "unskilled" labor and $84.61 for "skilled" labor, with additional premiums for overtime and weekends.  *See, e.g.*, [Doc. 64-7 at 4–5; Doc. 64-11 at 3–4].  The going hourly rate for each of these categories of labor in Brazil averaged only $9.82.  [Doc. 63-2 at 4].

---

[9] Zurich America refers to Critério as "*Zurich Brazil's* engineering and auditing contractor."  [Doc. 59 at ¶ 5 (emphasis added)].  However, whether it was Zurich America or Zurich Brazil that retained Critério is immaterial for purposes of resolving the Motions for Summary Judgment, as discussed further herein.

33.     Zurich Brazil ultimately agreed to an hourly rate of $34.00 for all local laborers, which resulted in a reduction of approximately $1.35 million from the original amounts Interstate invoiced, and also agreed to "consider[]" an additional $1 million for vendors and subcontractors, subject to Interstate providing additional information.  [Doc. 63 at ¶ 24; Doc. 69 at ¶ 24; Doc. 63-3 at 1].[10]

34.     David Buck ("Mr. Buck") of Sedgwick – Cunningham Lindsey – MCL Global ("Sedgwick US") works as an independent adjuster under the Marriott property insurance program, and has done so for more than two decades.  [Doc. 63 at ¶ 27; Doc. 73 at ¶ 27; Doc. 63-17 at 7:24–8:10, 250:2–3].[11]  Mr. Buck describes his role as follows: "[T]o receive loss notices from properties that participate in that [Marriott property insurance] program, investigate the cause of loss, investigate the damages, the repairs, the costs for those repairs, make my recommendations to both Marriott and Zurich North America on the policy and the damages from the investigation."  [Doc. 63-17 at 9:9–16].

35.     Mr. Buck was retained to investigate the loss at the Sheraton and determine the extent of Zurich America and/or Zurich Brazil's liability.  *See* [Doc. 63 at ¶ 27; Doc. 69 at ¶ 27; Doc. 70-9].

As discussed below, genuine factual disputes exist that preclude summary judgment in

---

[10]The Parties dispute whether Interstate provided more information. [Doc. 63 at ¶ 24; Doc. 69 at ¶ 24].

[11] Marriott describes Mr. Buck as "Zurich's adjuster," [Doc. 63 at ¶ 27], whereas Zurich America describes Mr. Buck as "Marriott's designated international adjuster," [Doc. 59 at ¶ 6].  At his deposition, however, Mr. Buck testified that he is "the agreed mutual nominated adjuster by Marriott and Zurich North America."  [Doc. 59-24 at 9:9–10].  Mr. Buck explained further: "My understanding is that Marriott has presented me to Zurich as a nominated adjuster.  Zurich has agreed to that nomination.  So I work -- so both of them have agreed for my role in this program to handle property losses."  [*Id.* at 9:21–25].

favor of Marriott.

### B.      Breach of Contract

The Parties agree that Colorado law applies to Interstate's claims.  *See, e.g.*, [Doc. 63 at 15; Doc. 69 at 9]; *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").  In interpreting a contract, the primary goal of courts is to "give effect to the parties' intent," which "is primarily determined from the language of the instrument itself."  *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022).  To make this determination, courts "must first establish whether the provisions of the parties' agreement are ambiguous."  *Id.*  Courts determine whether a contract is ambiguous by examining the contract's language and construing the language "in harmony with the plain and generally accepted meaning of the words employed."  *Id.*  If the contract terms are ambiguous—i.e., susceptible of more than one reasonable interpretation—courts may look to extrinsic evidence to establish the parties' intent.  *Id.*  A motion for summary judgment allows for contract interpretation as a matter of law if the court determines that the contract is unambiguous.  *See Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1055 (D. Colo. 2013) (citations omitted).  But when the court determines a contract is ambiguous, the meaning of its terms is generally an issue of fact.  *Id.*  Therefore, before a moving party can attack a contract claim on summary judgment, the moving party must first show that the contract is unambiguous and can be construed as a matter of law.  *Id.*

Fundamentally, the Parties disagree about which agreements are applicable to Interstate's claims (if any) and what those terms require.  Interstate contends that the operative contract in this case "has multiple components, some written and some oral," and all of which "embodied one fundamental meeting of the minds: fix my hotel, and I will pay you on a time and materials basis."

[Doc. 69 at 10].  According to Interstate, those agreements include: (1) the initial telephone call between Mr. Mastrapa and Mr. Conrad; (2) the AWO; (3) the four NAWOs; (4) various Scope Letters, *see* [Doc. 70-14]; (5) a Time and Materials ("T&M") Rate Schedule, [Doc. 63-1]; (6) a General Contractor ("GC") Rate Schedule, [Doc. 64-1]; and (7) "oral approval of the GC Rate Schedule by David Buck, nominated claims adjuster for Sedgwick and apparent agent of Marriott." [Doc. 69 at ¶ 11].  Interstate expressly does not include the RRC as part of the documents that constitute "[t]he operative contract in this case."  [Doc. 69 at 4].  Marriott disagrees that all of the above agreements and communications constitute a single "juggernaut agreement," [Doc. 73 at 4–6], and argues instead that the only agreements the Court should consider are (1) the initial phone call between Mr. Mastrapa and Mr. Conrad; (2) the AWO; (3) the four NAWOs; and (4) the RRC. [Doc. 63 at 13–19; Doc. 73 at 4–9].

   ***What constitutes the contract?***  As an initial matter, this Court finds that there are genuine issues of material fact as to what constitutes the contract underlying Interstate's breach of contract and unjust enrichment claims, and what precise terms such contract includes.  The Parties' dispute implicates the issue of contract integration, i.e, which of several writings did the contracting parties intend to be "part and parcel of the overall deal."  *Nelson v. Elway*, 908 P.2d 102, 116 (Colo. 1995) (Lohr, J., dissenting).  "A fundamental rule of contract law is that the court should strive to ascertain and effectuate the mutual intent of the parties."  *Powder Horn Constructors, Inc. v. City of Florence*, 754 P.2d 356, 365 (Colo. 1988).  The intent of the parties "may be determined by reference to separate ancillary instruments."  *Id.*  Reference to external instruments does not apply, however, "when the contract itself is fully integrated and the contract term to be construed is unambiguous."  *Maryland Cas. Co. v. Formwork Servs., Inc.*, 812 F. Supp. 1127, 1129 (D. Colo. 1993).  A partially "integrated agreement exists when the parties to a contract have reduced to a

final written expression one or more terms of their agreement," whereas a fully integrated agreement "is an integrated agreement adopted by the parties as a *complete and exclusive statement of the terms of the agreement*.'"  *United States v. Rockwell Int'l Corp.*, 124 F.3d 1194, 1199 (10th Cir. 1997) (emphasis added) (quotation omitted).  "To determine if [multiple] contracts should be integrated, courts in Colorado have considered the following factors: (1) whether the contracts expressly incorporate each other; (2) whether the contracts reference each other; (3) whether the contracts have separate and distinct consideration; and (4) whether the contracts have separate and distinct performance obligations."  *In re Centrix Fin., LLC*, 434 B.R. 880, 884 (Bankr. D. Colo. 2010) (footnote omitted).

The AWO and the four NAWOs do not include integration or merger clauses.  *See* [Doc. 63-5; Doc. 64-4; Doc. 64-5; Doc. 64-6; Doc. 64-8]; *see also Summit Contractors, Inc. v. Legacy Corner, L.L.C.*, 147 F. App'x 798, 801 (10th Cir. 2005) ("A merger clause tends, of course, to establish the intent of the parties that the writing shall be an integration of their agreement." (quotation omitted)).  The only document that includes such a clause is the RRC, but the RRC makes no mention of the AWO and the four NAWOs—which makes its relationship to the other documents ambiguous.  *See* [Doc. 63-12].[12]  Marriott has failed to persuade this Court that it may determine, as a matter of law, what constitutes the operative contract.

***Conversation between Messrs. Mastrapa and Conrad.***   Indeed, it is undisputed that Interstate's involvement with the Sheraton began with a conversation between Mr. Mastrapa, of Marriott, and Mr. Conrad, of Interstate.  It is undisputed that Mr. Mastrapa is a Senior Vice President of Defendant Marriott, [Doc. 63-14 at 9:14–16]—potentially an employee who can bind

---

[12] Further, the RRC pertains only to "Phase 2 of water damages repairs" that Interstate was not engaged to perform.  *See* [Doc. 63-12 at 1; Doc. 69-5 at 95:2–7].

the corporation.  It is also undisputed that Interstate entered the AWO only after Mr. Mastrapa contacted Mr. Conrad to request Interstate's immediate help with the repairs at the Hotel.  *See, e.g.*, [Doc. 63-4 at 1 (Mr. Conrad's email to Mr. Mastrapa following their conversation, stating: "Per our telephone conversation this morning, attached is the Advanced Work Authorization for Sheraton Grand Rio Hotel and Resort.  I need it completed on your end and sent back to me ASAP.")].

Under Colorado law, "an oral agreement is not superseded or invalidated by a subsequent integrated writing if the oral agreement (1) is not inconsistent with the terms of the integrated contract and (2) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract."  *Kipp v. Gen. Growth Props.*, 525 P.2d 510, 511 (Colo. App. 1974) (quotation omitted); *see also Boyer v. Karakehian*, 915 P.2d 1295, 1299 (Colo. 1996) ("[T]he parol evidence rule does not bar admission of oral representations which are not inconsistent with the terms of the final written instrument and are not of the type that one would necessarily expect to be incorporated into the final agreement."); Restatement (Second) of Contracts § 209 (1981).

**The AWO.**  The AWO, signed the same day, thus stated that Interstate was authorized to "mobilize, commence and perform" the repairs at the Hotel.  [Doc. 63-5 at 1].  Significantly, contrary to Marriott's assertion, the face of the AWO does not clearly establish that "Owner" as used in that document excludes Marriott.  *See* [Doc. 63 at 13 ("The face of the AWO shows it is between Interstate and . . . Companhia.")].

First, the AWO does not define the term "Owner," and "Companhia" is not mentioned anywhere in that document.  *See* [Doc. 63-5].  Nor has Marriott persuaded this Court that it is unambiguous that the definition of "Owner" necessarily is limited to direct, corporate ownership.

Indeed, even if that were the case, there appears to be a material dispute as to the legal ownership of the Sheraton at the time of the contracting.[13]

Second, the fact that Ms. Gomes signed the AWO does not unambiguously exclude Marriott from being subsumed by the term "Owner." Marriott argues the contrary by pointing to the "Authority" clause in the AWO, which states that:

> [T]he undersigned represent(s) and warrant(s) to Interstate that he/she: (i.) is the person properly authorized to enter into this Advanced Work Order; (ii.) is doing so on behalf of *all owners of the Property/Project*; (iii.) will communicate the contents of this Advanced Work Order, including representations made herein, to all owners of the Property and, by allowing Interstate to proceed with the Work, all owners hereby ratify this Advanced Work Order and terms contained herein.

[*Id.* at 1 (emphasis added); Doc. 63 at 13]. However, the plain language contemplates that there could be more than one owner of the Property/Project. Even crediting Marriott's argument that the Sheraton is not directly owned by Marriott, nothing on the face of the AWO excludes Marriott from being considered an Owner together with its consolidated subsidiary, Companhia.

Third, this Court cannot overlook the potential import of the initial conversation between Messrs. Mastrapa and Conrad in interpreting the term "Owner" as used in the AWO. Interstate's

---

[13] For instance, in maintaining that it "does not own" the Sheraton, [Doc. 63 at ¶ 1], Marriott relies exclusively upon the Declaration of Randi Neches, a "managing paralegal" at Marriott. [Doc. 63-13 at ¶ 1]. Ms. Neches states that "[s]ince 2019, the Hotel has been owned and managed by Companhia" and "[t]he Hotel employees are employed by the Hotel's manager (and owner), Companhia." [*Id.* at ¶ 7]. In its Response, Interstate counters by citing, for example, excerpts from Marriott's SEC Form 10-K for the fiscal year ending December 31, 2019. [Doc. 69-1]. In that form, Marriott states "we owned or leased the following hotel properties," and then identifies the "Sheraton Grand Rio Hotel & Resort" under "Owned Hotels." [*Id.* at 2–3]. In its Reply, Marriott argues that the term "we" used in the Form 10-K is defined to include Marriott "together with its consolidated subsidiaries." [Doc. 73 at 2; Doc. 73-1 at 3]. Ms. Neches's Declaration states that the Sheraton has been owned by Companhia "[s]ince 2019" generally but fails to identify precisely when in 2019 Companhia became the owner, which is notable given that the mudslide at the Hotel occurred in early February 2019 and at least Interstate dated the AWO February 8, 2019. [Doc. 63-5].

corporate representative, Matthew Wenstrom ("Mr. Wenstrom"), testified that it was Interstate's position that it entered a written contract with "Marriott International." [Doc. 69-2 at 64:10–16]. And, according to Mr. Conrad's testimony, Mr. Mastrapa did not state that Companhia was responsible for payment for the repair work. *See* [Doc. 63-16 at 176:15–177:18]. Further, neither Marriott nor Interstate claim that Mr. Mastrapa ever mentioned Companhia during that initial phone call. *See generally* [Doc. 63; Doc. 69; Doc. 73]. In addition, Mr. Conrad testified that he had "verbal or oral contracts with Marriott International" specifically over the 18 years that he has worked on the Marriott account. [Doc. 69-3 at 43:24–44:3]; *see also* [*id.* at 43:15–20 ("There was a verbal conversation between Hector Mastrapa and myself . . . then I subsequently went to Mr. Wenstrom for approval for Interstate to engage and mobilize to Brazil, and that historically had constituted an agreement between Marriott and Interstate to take on the project.")]. While Mr. Mastrapa separately testified that it was "very rare for me at my level *to make the initial contact* with Mr. Conrad regarding a loss at a hotel," despite the fact he did so in this instance, he was not aware of any contact between anyone at the Hotel and Interstate regarding the damages before he contacted Mr. Conrad. [Doc. 69-5 at 31:16–33:10 (emphasis added)]. And to the extent that Marriott invites the Court to credit one witness's testimony about the intent of the parties over another to determine who constitutes the "Owner" under the AWO, this Court cannot do so because credibility and the weighing of evidence is appropriately within the province of the factfinder.[14]

---

[14] Interstate further points to internal emails from Marriott indicating that Marriott has at least some ownership stake in the Sheraton. *See* [Doc. 70 at 1 (Marriott management stating that the "ownership group[]" for the Sheraton is Companhia, and that entity is "owned by Marriott"); Doc. 70-1 at 2 (Mr. Mastrapa's assertion that "we own the hotel"); Doc. 70-2 (conversation between Mr. Mastrapa and another Marriott employee, with the employee confirming that Marriott "own[s] the [Sheraton Grand Rio] hotel")]; *see also* [Doc. 63-6 at 1 (Mr. Mastrapa's email stating: "It's worth noting we've had two other heavy rain incidents which have led to further water damage. Zurich engineering visited the hotel and made certain infrastructure recommendation to mitigate

**The NAWOs.**  The NAWOs similarly do not unambiguously exclude Marriott from being a party to the agreements.  Like the AWO, the NAWOs do not define the term utilized, i.e., "Client/Owner".  [Doc. 70-4].  Marriott concedes that none of these NAWOs state who is the "Client/Owner."  *See* [Doc. 63 at ¶ 18 (citing [Doc. 64-4; Doc. 64-5; Doc. 64-6])].  Marriott also concedes that the inclusion of the term "Client" could mean someone other than the Owner, as used in either the NAWO or the AWO.  *See* [*id.* at 16 ("But, conceivably, the inclusion of the word 'Client' could mean someone other than the owner of the Hotel.")].  Here, the NAWOs list "Marriott International" as the "Company Name" and within the Project Name.  *See* [Doc. 70-4].  In addition, Ms. Gomes, who signed the AWO, also signed the NAWOs, and she is identified as the "General Manager," presumably for the identified Company.  [*Id.* at 1].  This Court cannot ascertain from the record before it that Marriott is not a party to the NAWOs as a matter of law.[15]

**The RRC.**  The RRC undisputedly contains an integration clause.  [Doc. 63 at 18-19; Doc. 63-12 at 7].  But it also (1) pertains only to "Phase 2 of water damages repairs" that Interstate was

---

future water damage.  These recommendations will require ownership (Marriott) captital [sic].")].  This evidence simply reinforces this Court's conclusions that there are genuine issues of material fact.

[15] Marriott argues that, pursuant to Colorado law, any contractual ambiguities should be strictly construed against Interstate since "[t]he NAWOs were on Interstate's fillable form contract, drafted by Interstate, and [Mr.] Porterfield of Interstate filled in the project-specific details."  [Doc. 63 at 16–17].  The Court respectfully declines Marriott's invitation to apply the principle of construing ambiguities against the drafter of the contract.  This principle, called *contra proferentem*, "is the last rule to be resorted to, and never to be applied except when other rules of interpretation fail."  *Quad Constr., Inc. v. Wm. A. Smith Contracting Co.*, 534 F.2d 1391, 1394 (10th Cir. 1976).  "Courts in Colorado 'have consistently looked to the intent of the parties as the primary means of resolving ambiguity, and although no court since *Patterson* [*v. Gage*] has expressly stated that *contra proferentem* should only be applied as a last resort, that principle has not been rejected.'"  *W. Ridge Grp., LLC v. First Tr. Co. of Onaga*, 414 F. App'x 112, 123 (10th Cir. 2011) (quoting *Moland v. Indus. Claim Appeals Off.*, 111 P.3d 507, 511 (Colo. App. 2004)).  Accordingly, the Court will "not rely on this interpretive rule before the parties have had a chance to put on evidence of their intent."  *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1166 (10th Cir. 2014).

not engaged to perform, *see* [Doc. 63-12 at 1; Doc. 69-5 at 95:2–7]; (2) fails to define what "Phase 1" included, *see generally* [Doc. 63-12]; (3) does not refer to the AWO or any of the NAWOs, *see* [*id.*]; and (4) given the ambiguities of the AWO and the NAWOs, may or may not involve the same parties. *See supra.*  Given these material disputed facts, this Court cannot determine that the RRC unambiguously applies to Interstate's work at the Sheraton, or precludes its breach of contract claim against Marriott.

     ***Damages.***  Marriott also argues that even if it contracted with Interstate to repair the Hotel, Interstate cannot establish its breach of contract claim because (1) Interstate was required to obtain "insurer approval for its rates" to receive payment, "which it apparently never did," and (2) Interstate cannot show that Marriott ever agreed to its rates.  [Doc. 63 at 19–20].  Marriott insists that "Interstate has no written documentation agreeing to its rates."  [*Id.* at 19].  Neither of Marriott's arguments warrants summary judgment.

     As an initial matter, damages will turn on what the contractual terms are—which cannot be unambiguously determined at this juncture.  For instance, the AWO provides in relevant part that "Owner agrees to pay, *whether or not such Work is covered by insurance*, Interstate for all labor, materials, and equipment utilized to perform the Work."  [Doc. 63-5 at 1 (emphasis added)].  Thus, to the extent that Marriott is a party to the AWO, Zurich America's and/or Zurich Brazil's positions regarding Interstate's rates may be irrelevant to Interstate's breach of contract claim.  This Court also notes that Marriott's argument regarding insurer approval is not based on any contract provision, but instead on extrinsic evidence regarding a previous course of conduct.  *See, e.g.*, [Doc. 63-16 at 144:20–25 (Mr. Conrad's testimony that, generally, "one of the processes involved" in ensuring "Interstate gets paid is Zurich's agreement to the rates for the work")].  Given the contractual ambiguity and fact that the construction of the contract and Marriott's

proposed payment requirements depend on extrinsic evidence, then the interpretation of the contract—and the availability of damages—becomes a question of fact reserved for the factfinder. *See Stegall v. Little Johnson Assocs., Ltd.*, 996 F.2d 1043, 1048 (10th Cir. 1993) ("If the court determines a contract is ambiguous and its construction depends on extrinsic evidence, then interpretation of the contract becomes a question of fact.").

Second, at summary judgment, Interstate need not affirmatively prove that Marriott agreed to its rates. Rather, Interstate need only point to admissible evidence sufficient to create a genuine issue of material fact. *See Stroh Ranch*, 935 F. Supp. 2d at 1055 ("Once the matter raises a 'genuine issue' of fact, this effectively defeats a motion for summary judgment."). Interstate claims that its rates are located in two documents: the T&M Rate Schedule and the GC Rate Schedule. *See* [Doc. 63-1; Doc. 64-1]; *see also* [Doc. 69 at ¶ 11]. The Parties agree that the T&M Rate Schedule is incorporated by reference in the AWO. [Doc. 63 at ¶ 25 ("The AWO references rates provided on 'Attachment B.'"); *id.* at ¶ 29 (Marriott's acknowledgment that "Attachment B" (i.e., the T&M Rate Schedule) is "referenced in the AWO"); Doc. 63-5 at 1; Doc. 69 at ¶ 25]. The NAWOs similarly reference the T&M Rate Schedule. Specifically, the NAWOs state, "[c]lient agrees to make payment to INTERSTATE per the payment terms outline [sic] in the National Account Agreement," and each document has a checkmark in a checkbox next to the terms "*T & M (Based on INTERSTATE'S T&M Rate Schedule per the Agreement).*" *See, e.g.*, [Doc. 64-5 (emphasis added)]. As for the GC Rate Schedule, which are higher than those in the T&M Rate Schedule, its applicability will also need to be ascertained from extrinsic evidence. *See, e.g.*, [Doc. 63 at ¶ 18 (citing [Doc. 63-20 at 142:5–143:7])].

Construing all inferences in favor of the non-moving party as it must, this Court cannot conclude that Marriott is entitled to summary judgment on Interstate's breach of contract claim.

## C.      Unjust Enrichment

Marriott also seeks summary judgment on Interstate's unjust enrichment claim (Count III).

[Doc. 63 at 21].

> Unjust enrichment is a form of quasi-contract or a contract implied in law.  As such, it is an equitable remedy and does not depend on any contract, oral or written.  The theory does not require any promise or privity between the parties.  Rather, it is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another.

*Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000) (citations omitted).  To recover on a claim

for unjust enrichment, a plaintiff must prove: "(1) at [it]s expense (2) defendant received a benefit

(3) under circumstances that would make it unjust for defendant to retain the benefit without

paying."  *Id.* at 1265–66.

Marriott argues that Interstate cannot establish the second element on the grounds that "the

benefit Interstate conferred was not on [Marriott] itself, but rather the owner of the Hotel," and

"[b]ecause [Marriott] does not own the Hotel, it did not receive the benefit [from] Interstate's

work."  [Doc. 63 at 21].  The Court has already discussed the factual ambiguity regarding the terms

"Owner" and "Client/Owner" as used in the AWO and NAWOs, respectively.  *See supra*, Section

I.B.  Therefore, this argument fails for the same reasons as Marriott's arguments on this issue with

respect to Interstate's breach of contract claim.  In addition, the Court is not persuaded by

Marriott's argument for yet another reason: the evidence does not establish that Marriott received

no benefit from Interstate's repairs at the Hotel.  Indeed, according to Marriott, the Hotel in this

case is one of several "Marriott-branded" hotels.  *See* [Doc. 63 at ¶ 2].  And the fact that Marriott

executives (e.g., Mr. Mastrapa) helped to, at a minimum, coordinate the repair work at one of its

"branded" hotels does not persuade the Court that Marriott received no benefit at all from those

repairs.

Marriott also contends that Interstate cannot establish the third element of its unjust enrichment claim, reasoning that Marriott "*has paid*, and, in turn, Interstate has been paid." [*Id.* at 21]. For support, Marriott (1) references the premiums that it and other "owners of Marriott-branded properties" have paid to Zurich for insurance coverage, and (2) asserts that "Interstate has [already] been paid $4.55 million, in large part because of [Marriott's] influence," and this amount is "well above the value of those services in Brazil" as estimated by "Zurich Brazil's expert consultant, Crit[é]rio." [*Id.*]. However, the crux of Interstate's claim is that the $4.55 million it has already received is less than the approximately $7.2 million that it invoiced for its work *under the operative repair contract*. *See* [Doc. 32 at ¶¶ 65–66]. And, as Interstate argues in its Response, Marriott's position "begs the question of whether Marriott paid *enough* to avoid an inequity." [Doc. 69 at 15]. Because Marriott has failed to establish an absence of any genuine issue of material fact on this third element—i.e., whether the $4.55 million that Interstate has already received is a just amount under the specific factual circumstances of this case—resolution of Interstate's unjust enrichment claim is inappropriate for summary judgment. *See Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009) ("Trial courts must engage in fact-based inquiries, and then make extensive factual findings, to determine whether a party is entitled to recover under an unjust enrichment claim.").

Marriott also contends, briefly, that Interstate cannot establish its unjust enrichment claim because "its work is governed by contracts." [Doc. 73 at 9]. However, Marriott raised this argument for the first time in its Reply brief. *See* [*id.*]. When a party puts forth new arguments in a reply brief, a court may avoid error by either (1) choosing not to rely on the new arguments in determining the outcome of the motion; or (2) permitting the nonmoving party to file a surreply. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006). Here, given

Marriott's cursory discussion of this issue, the Court declines to rely upon Marriott's new argument in resolving the instant motion.[16]

In sum, material factual issues remain in dispute as to whether Marriott was the party that entered the repair contract with Interstate.  Accordingly, Marriott's Motion is **DENIED**.

## II.      Zurich America's Motion for Summary Judgment

Zurich America seeks summary judgment with respect to the single claim Interstate has asserted against it: intentional interference with contract (Count II).  [Doc. 32 at 11].

### A.      Undisputed Material Facts

#### Zurich Brazil, Sedgwick US (David Buck), and Critério

1.      The Hotel was insured by policies from Zurich America and Zurich Brazil.  [Doc. 59-13 at 228:15–24; Doc. 59-6; Doc. 59 at ¶ 4; Doc. 67 at ¶ 4].

2.      Interstate had some communications regarding the loss at the Hotel with Zurich Brazil; Zurich's third-party administrator, non-party Sedgwick do Brasil Ltda. ("Sedgwick

---

[16] Even so, Marriott's argument here weighs in favor of denying its summary judgment motion. Notably, although Marriott "agrees that Interstate has contracts to fix the Hotel," [Doc. 73 at 9], it nevertheless maintains that it is not a party to those contracts. *See* [*id.*].  "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Invs., LLC v. Eagle River Water and Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  However, a plaintiff can recover on an unjust enrichment claim when it "will have no right under an enforceable contract." *Id.*  Thus, even if the recovery a plaintiff seeks under its unjust enrichment claim is identical to the relief it seeks under a breach of contract claim, "it is well[-]established that a plaintiff may seek alternative theories of recovery, even when only one of those theories could actually bear fruit at trial." *Bd. of Cnty. Comm'rs of Cnty. of La Plata v. Brown Grp. Retail, Inc.*, 598 F. Supp. 2d 1185, 1192 (D. Colo. 2009).  Here, assuming Marriott prevails on its defense that it is not a party to the repair contract with Interstate, and thereby did not breach any such contract, a reasonable jury could nevertheless decide in favor of Interstate under its unjust enrichment theory if it can meet its burden of proof on this claim at trial.

Brazil"); and Zurich's engineering and auditing contractor, non-party Critério.  [Doc. 59 at ¶ 5; Doc. 67 at ¶ 5].[17]

3.  Mr. Buck of Sedgwick US "was engaged to provide monitoring and facilitation support" for the loss at the Hotel.  [Doc. 59-9 at 188:19–189:25; Doc. 59-24 at 38:5–13; Doc. 59 at ¶ 6; Doc. 67 at ¶ 6].

***Disputes Over Interstate's Invoices***

4.  After Interstate submitted its invoices, Critério, Sedgwick Brazil, and Zurich Brazil disputed the invoices as excessive for the work in Brazil and partially unsupported.  [Doc. 59 at ¶ 10].[18]

---

[17] The Court uses the terms "third-party administrator" and "engineering and auditing contractor" to describe Sedgwick Brazil and Critério, respectively, because those are the terms used by Zurich America in its Opening Brief.  [Doc. 59 at ¶ 5].  The Court does not, however, claim that these terms accurately describe those entities, particularly given that Interstate uses different terms to describe them.  *See* [Doc. 67 at ¶ 5 (referring to Sedgwick Brazil as "Zurich Brazil's adjuster" and Critério as a "claim consultant")].  And the Court does not find that such designations have any material bearing on the outcome of the instant Motion.

[18] Interstate disputes this fact on the basis that the exhibit Zurich references for support—a Portuguese-language presentation, [Doc. 59-11]—"was presented by Sedgwick Brazil and Critério to Buck and others in late July 2019, approximately five months after Interstate sent Marriott its first invoice for the project," and "Interstate was not privy to that presentation, and may have been unaware of any dispute concerning its invoices until December 2019."  [Doc. 67 at ¶ 10].  The Court finds Interstate's dispute to be unfounded.  Indeed, whether or not Interstate was *aware* of the disputes over its invoices has no bearing on the fact that such disputes arose, at a minimum, between Critério, Sedgwick Brazil, and Zurich Brazil.  Significantly, Interstate's assertion that it may have been unaware of any dispute concerning its invoices until December 2019" is contradicted by Interstate's concession that "Interstate communicated directly with Critério . . . once this dispute initially arose."  *Compare* [Doc. 59 at ¶ 33] *with* [Doc. 67 at ¶ 33].  And, in any event, disputes over the amount in the invoices is central to Interstate's claims in this lawsuit.  *See, e.g.*, [Doc. 67 at ¶ 14 (Interstate's assertion that "[t]he U.S. labor rates that Interstate charged Marriott remain the biggest point of contention between the parties")].  Moreover, the Court does not rely on the Portuguese-language presentation cited by Zurich in finding this fact undisputed, given that (1) it is, indeed, in Portuguese, and (2) Zurich improperly cited to this presentation "generally," [Doc. 59 at ¶ 10], despite the fact that it contains a total of 60 pages, *see* [Doc. 59-11].

5.     Interstate communicated directly with Critério once this dispute initially arose around the end of May 2019.  [Doc. 59-22 at 1–2; Doc. 59 at ¶ 33; Doc. 67 at ¶ 33].

6.     Although there were numerous issues that concerned the Brazilian loss team,[19] the largest was that Interstate was billing out local Brazilian labor at higher United States labor rates. [Doc. 59 at ¶ 14; Doc. 67 at ¶ 14; Doc. 59-11 at 29].

7.     Zurich Brazil refused to reimburse the Property for certain categories of Interstate's bills.  [Doc. 59-13 at 150:1–152:11; Doc. 59 at ¶ 16; Doc. 67 at ¶ 16].[20]

8.     Interstate is relying on the terms of the AWO—in particular, the provision stating that "Owner agrees to pay, whether or not such Work is covered by insurance, Interstate for all labor, materials, and equipment utilized to perform the Work," [Doc. 67-1 at 1]—to seek full payment for the amounts stated in its invoices.  [Doc. 59-20 at 60:20–61:6; Doc. 59 at ¶ 12; Doc. 67 at ¶ 12].

### Zurich America's Role in the Rate Dispute

9.     Because Marriott has an account with Zurich America, Zurich America assigned one of its employees, John Harmon ("Mr. Harmon"), to monitor the loss at the Hotel, among other duties.  *See, e.g.*, [Doc. 59-9 at 47:17–49:6; *id.* at 51:15–52:6; Doc. 59 at ¶ 23; Doc. 67 at ¶ 23].

10.     Interstate first communicated with Zurich America regarding the repairs at the Hotel on November 12, 2019 (i.e., after the dispute arose regarding Interstate's invoices).  [Doc.

---

[19] Although the Parties fail to define this term, the Court presumes that the "Brazilian loss team" refers to Zurich Brazil, Sedgwick Brazil, and Critério.

[20] Zurich America explains that: "As the Property's insurer, Zurich Brazil does not pay contractors directly.  Rather, an insured, such as the Property must submit bills from its contractors to Zurich Brazil, who in turn evaluates and adjusts what portion of the billed amounts are recoverable under the insured's insurance policy.  Any amounts remaining after insurance payments to the insured are solely the responsibility of the insured."  [Doc. 59 at ¶ 16 n.1 (citing [Doc. 59-7 at 69:4–70:9])].

59-17 at 1; Doc. 59 at ¶ 27; Doc. 67 at ¶ 27].  Thereafter, Mr. Harmon attempted to bring all parties to the table to resolve this dispute—he was able to convince Zurich Brazil to raise its allowable local labor rates from $9.82/hour to $34/hour, but was ultimately unsuccessful in helping to resolve the entire dispute.  [Doc. 59-13 at 166:11–169:20; Doc. 59-18 at 1; Doc. 59 at ¶ 28; Doc. 67 at ¶ 28].

11.     This dispute met an impasse around September 2020 when Interstate demanded full payment for the amount of its invoices, without any reduction, to no avail from the party(ies) responsible for payment.  [Doc. 59-13 at 196:3–198:22; Doc. 59-18 at 1; Doc. 59-19 at 4–5; Doc. 59 at ¶ 29; Doc. 67 at ¶ 29].

## B.    Intentional Interference with Contact

Under Colorado law, a claim for intentional interference with contract, also called tortious interference with contract, has five elements: "(1) existence of a contract between the plaintiff and a third party; (2) knowledge of that contract by the defendant; (3) the defendant's intentional, improper interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 171 F. Supp. 3d 1092, 1120 (D. Colo. 2016) (citing, *inter alia*, *Colo. Nat'l Bank of Denver v. Friedman*, 846 P.2d 159, 170 (Colo. 1993)).  Zurich America seeks summary judgment against Interstate on the grounds that Interstate cannot establish the first three elements of its claim.  *See* [Doc. 59 at 8–17].  The Court will address each element in turn.

## 1.    Existence of a Contract Between Interstate and a Third Party

Zurich America argues that Interstate cannot demonstrate that it had a contract with Marriott and, therefore, it cannot show the "existence of a contract between the plaintiff and a third party" to meet the first element of its claim.  [*Id.* at 9–11].  However, as discussed above, material

facts remain in dispute as to whether Interstate's contract was with Marriott, as opposed to another party.  *See supra*, Section I.B.

## 2.    Knowledge of the Contract by Zurich America

Zurich America appears to claim that it had no knowledge of the repair contract, arguing that it "lacked notice of the alleged contract with [Marriott]" until November 2019, which was "well after reimbursement to Interstate had been rejected by Zurich Brazil."  [Doc. 59 at 11].  Therefore, Zurich America continues, any of its actions or representations "were not the cause of any breach by the contracting party in this dispute."  [*Id.*].  Respectfully, this argument misses the mark and construes Interstate's claims too narrowly.

Indeed, even assuming that Zurich America did not learn of the repair contract until November 2019, Interstate's intentional interference claim is not limited solely to Zurich America's conduct before that time.  Rather, Interstate's breach of contract claim is based on the theory that Marriott failed to pay the full amount for Interstate's restoration work at the Hotel under the applicable contract, and it is Interstate's position that Marriott is *still in breach* of the contract.  *See, e.g.*, [Doc. 32 at ¶ 67 ("Marriott still owes Interstate $2,668,155.39 in principal under the invoices.")].  Indeed, Zurich America acknowledges that Interstate is "relying upon its contracts" to seek payment for its work.  [Doc. 59 at ¶ 12].  Thus, given the present status of the alleged contractual breach at issue, it is clear that Zurich America's purported lack of notice of the operative contract until November 2019 has no bearing on the "knowledge" element of Interstate's intentional interference claim.  *See, e.g.*, [Doc. 68-5 at 3 (email from a Zurich representative to Marriott on January 19, 2021, stating, "[w]e position that the $4.5M payment issued to Interstate is the total amount owed for services rendered based on the contract pricing")].  Accordingly, the Court finds that Zurich America has failed to show an absence of a genuine factual dispute on this issue.

### 3.    Whether Zurich America's Conduct was Intentional and Improper

#### a.    Intentional Interference

As to whether Zurich America's conduct was intentional, the relevant inquiry is whether Zurich America acted or spoke "for the purpose, in whole or in part, of bringing about a particular result," or if it knew that its "acts or words [were] likely to bring about that result," namely, to bring about the breach of non-performance of the repair contract. Colo. Jury Instr., Civil § 24:2 (2017 ed.); *see also Mueller v. Swift*, No. 15-cv-01974-WJM-KLM, 2017 WL 2362137, at *8 (D. Colo. May 31, 2017).

Here, Zurich America contends that even if this Court finds that the repair contract was indeed between Interstate and Marriott, Marriott "did not believe it [was a party to the contract] at all relevant times" and, "[c]onsistent with that belief," Marriott did not rely or act upon any comments or recommendations by Zurich America with respect to approving payments to Interstate. [Doc. 59 at 12 (citing [Doc. 59-7 at 96:14–97:7])]. Zurich America also asserts that "[w]ithout reliance, there can be no interference." [*Id.*]. Respectfully, the Court remains unpersuaded that Zurich America is entitled to summary judgment as a matter of law.

First, the deposition testimony cited by Zurich America is contradictory on this position.[21]

---

[21] For instance, in that deposition testimony, a Marriott executive testified that Marriott would not be involved in retaining goods or services submitted by a vendor, "so [Marriott] would not be relying upon Mr. Buck for anything." [Doc. 59-7 at 95:23–97:7]. As previously mentioned, Mr. Buck is an employee of Sedgwick US, not Marriott. Notably, in the three lines of deposition testimony immediately preceding that cited by Zurich America, the Marriott executive testified that it was her understanding that "*Mr. Buck [was] speaking on behalf of . . . Zurich.*" [*Id.* at 96:11–13 (emphasis added)]. And yet, here—despite Zurich America's reliance on this testimony referencing Mr. Buck to support its position that "any comments, communications, or insight provided by [Zurich America] were not acted upon by [Marriott]," [Doc. 59 at 12]—it is *also* Zurich America's express position that Mr. Buck was *not* acting as an agent of Zurich. [*Id.* at 17 ("Buck was not the agent of [Zurich America] for this loss.")].

Second, Zurich America expressly acknowledges that Mr. Harmon "was able to convince Zurich Brazil to raise its allowable local labor rates" to $34/hour.  [*Id.* at ¶ 28].  Likewise, Mr. Harmon testified that Zurich America would "offer suggestions" to Zurich Brazil regarding rates, and Zurich Brazil, in turn, "gave consideration to its merits and they adjusted accordingly."  [Doc. 59-13 at 168:9–21].  This testimony, at a minimum, indicates Zurich America's intent to bring about a particular result—namely, adjusting the rates that Interstate would ultimately receive for its work.

Third, Zurich America attempts to improperly shift the focus from its *own* conduct with respect to the intentional interference claim to the issue of whether Marriott *believed* it had a contract with Interstate and, by extension, whether Marriott "relied" on any statements made by Zurich America with respect to its performance under the contract.  *See* [Doc. 59 at 12].  But emails in the record raise a genuine factual dispute as to whether Marriott did or did not rely upon Zurich America with respect to the amount that Interstate was to be paid for its work.  *See, e.g.*, [Doc. 68-11 at 3 (November 2019 emails between Mr. Harmon and Marriott regarding payment to Interstate, including a statement by Mr. Harmon that "no additional payments are supported at this time and Interstate has been compensated for services performed to date"); Doc. 68-5 at 2–3 (email from a Mr. Harmon to Marriott on January 19, 2021, stating, "[w]e position that the $4.5M payment issued to Interstate is the total amount owed for services rendered based on the contract pricing")].

Accordingly, at a minimum, a disputed factual issue exists as to whether Zurich America—in discussing Interstate's invoices with Marriott, Zurich Brazil, Critério, Sedgwick US, and/or Sedgwick Brazil—acted for the purpose, in whole or in part, of bringing about an incomplete payment of the total amount of Interstate's invoices for the work it performed under the repair contract.

### b.      Improper Interference

To establish liability, a plaintiff must also prove that the defendant's interference was "improper." *Warne v. Hall*, 373 P.3d 588, 595 (Colo. 2016).  However, the Colorado Supreme Court has "never attempted to rigidly define 'improper' for all purposes of interference with contract," *id.*, and the question "depends on the facts of each case." *Watson v. Settlemeyer*, 372 P.2d 453, 456 (Colo. 1962).   Nevertheless, to determine whether interference is improper, Colorado courts consider the factors listed in the Restatement (Second) of Torts § 767:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Robinson*, 209 P.3d at 1196; *see also Warne*, 373 P.3d at 596 ("[W]e have favorably referenced [§ 767] . . . and its enumeration of potentially relevant factors.")].  Viewing all the evidence in Interstate's favor, and accepting its version of the facts as true, the Court concludes that a genuine dispute remains for trial as to whether Zurich America acted improperly.  Several considerations lead to this conclusion.

As an initial matter, Interstate points to the January 2019 email between Mr. Harmon at Zurich America and Mr. Buck at Sedgwick US, which indicates that Zurich America played at least *some* role in Marriott's determination of the amount to pay Interstate for its work. *See* [Doc. 68-5 at 1–5].  In that email, Mr. Harmon stated in relevant part: "We position that the $4.5M

payment issued to Interstate is the total amount owed for services rendered based on the contract pricing.  Any additional amount to be considered verified by Sedgwick and Critério."  [*Id.* at 3]; *see also* [Doc. 67 at 17–18].

Zurich America disagrees that Mr. Harmon's email supports Interstate's intentional interference claim.  Specifically, Zurich America contends that the Court should not interpret this email as Zurich America advising Marriott not to pay Interstate but, instead, Zurich America "was simply conveying [Zurich] *Brazil's* decision as to what portion it would cover under the policy, i.e.[,] what was the reasonable value of Interstate's work."  [Doc. 72 at 7 (emphasis added)]. Zurich America also cites excerpts from Mr. Harmon's deposition testimony to support that "the email to [Marriott] was simply to convey decisions being made down in Brazil by Zurich Brazil, not [Zurich America]."  [*Id.* (citing [Doc. 59-13 at 41:21–43:18])].  Again, the Court is not persuaded.

In arguing that it did not act improperly, Zurich America attempts to accomplish two goals. First, it seeks to characterize Mr. Harmon as merely a conveyor of information or "monitor and facilitator on the loss," [*id.*; Doc. 59 at 13], thereby minimizing (if not invalidating) any effect Mr. Harmon's conduct may or may not have had on Marriott's decisions regarding the amount to pay Interstate for its work.  *See, e.g.*, [Doc. 59 at 16 ("On or about November 12, 2019, [Marriott] asked Mr. Harmon to step into the dispute and facilitate a resolution between Zurich Brazil and Interstate after full payment had already been rejected by Zurich Brazil in June 2019.")].  However, these characterizations of Mr. Harmon's role do not constitute sufficient evidence of his actual conduct in helping to "facilitate" the loss—and it is more proper for a factfinder to determine Mr. Harmon's role based on the evidence placed before it.

Second, Zurich America attempts to separate its own conduct from that of Zurich Brazil. *See, e.g.*, [*id.*].   Importantly, however, Zurich America fails to present sufficient evidence to demonstrate (1) that its conduct is, in fact, distinguishable from Zurich Brazil's, or (2) that it had no stake or interest at all in the amount Marriott ultimately paid to Interstate for its repair work. For instance, despite Zurich America's assertion that "the Property and loss were insured by" Zurich Brazil, [*id.* at ¶ 4], Mr. Harmon testified that there are two policies relevant to the Hotel in this case: "a master and a local policy" issued by Zurich America and Zurich Brazil, respectively, with the master policy functioning as "an excess policy.  What's not covered under the local policy comes to the master for consideration." [Doc. 59-13 at 228:15–24].  And then, when asked whether "Zurich [America] has any kind of financial stake in the amount of money that Zurich Brazil pays out on a claim," Mr. Harmon responded in the affirmative, with the following explanation:

> Yeah. . . .  [B]ecause Zurich [America] is the producing country, ultimately Zurich [America] would fund the local payout wherever the claim is around the world.  In this particular case, it would be Zurich Brazil.  So Zurich [America] would fund it. Once the adjustment process has concluded locally, be it an advanced payment or final payment or whatever, once that adjustment process has been investigated and it's approved, then they send the cash call to Zurich [America] in order to issue the funds.  And it's just a financial transaction.  It has nothing to do with the actual claim approval itself.  But to answer your question, yes, so ultimately, other than a local retention with the reinsurance group in Brazil, ultimately Zurich pays for the claim, ultimately.  What I mean by paying for the claim, they fund it because they are the producing country.

[*Id.* at 108:2–25].  Mr. Harmon further clarified that "in this particular situation, ultimately Zurich [America]  funded the claim made by Marriott."  [*Id.* at 109:4–7].  In light of (1) Mr. Harmon's testimony, (2) the relationship between the Zurich entities and Marriott/the Hotel, and (3) the fact that Zurich America has been aware of the loss at the Hotel since the outset, *see, e.g.*, [Doc. 67-9 at 28–29], the Court finds that material factual issues exist as to whether Zurich America acted improperly.

In sum, because material factual disputes remain as to Zurich America's conduct, Zurich America's Motion is **DENIED**.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)     Zurich American Insurance Co.'s Motion for Summary Judgment [Doc. 59] is **DENIED**;

(2)     Defendant Marriott International, Inc.'s Motion for Summary Judgment [Doc. 63] is **DENIED**; and

(3)     A Telephonic Status Conference is **SET** for **April 4, 2023 at 10:00 a.m.**, for purposes of setting a Final Pretrial Conference/Trial Preparation Conference.  All participants shall use the following dial-in information: 888-363-4749, Access Code: 5738976 to participate at the designated time.

DATED:  March 15, 2023                            BY THE COURT:

                                                 Nina Y. Wang
                                                 United States District Judge