**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-01380-NYW-JPO

INTERSTATE RESTORATION, LLC,

      Plaintiff,

v.

ZURICH AMERICAN INSURANCE CO., and
MARRIOTT INTERNATIONAL, INC.,

      Defendants.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

      This case arises from property damage caused by a mudslide at the Sheraton Grand Rio Hotel & Resort in Rio de Janeiro, Brazil and the subsequent repairs performed by Plaintiff Interstate Restoration, LLC ("Plaintiff" or "Interstate"), which claims that it has not been paid in full for its work.  On April 23, 2021, Plaintiff filed a Complaint and Jury Demand in Denver District Court for the City and County of Denver, [Doc. 5], against Defendant Marriott International, Inc. ("Defendant Marriott International" or "Marriott International") and Defendant Zurich American Insurance Co. ("Defendant Zurich American" or "Zurich American").  Thereafter, Zurich American removed the case to the United States District Court for the District of Colorado based on diversity jurisdiction.  *See* [Doc. 1].  On August 31, 2021, Plaintiff filed its operative Amended Complaint and

Jury Demand[1] ("Amended Complaint"), in which it asserted three causes of action: (1) breach of contract against Marriott International ("Count I"); (2) intentional interference with contract against Zurich American ("Count II"); and (3) unjust enrichment against Marriott International ("Count III").  [Doc. 32].

Marriott International and Zurich American each respectively moved for summary judgment.  [Doc. 59; Doc. 63].  Finding genuine disputes of material fact, this Court denied summary judgment on March 15, 2023.  [Doc. 77].  The Parties proceeded before this Court for a four-day bench trial that commenced on August 28, 2023.  [Doc. 113; Doc. 114; Doc. 115; Doc. 116].  In addition to the live testimony that was presented at trial and the Parties' Stipulated Findings of Fact and Conclusions of Law, [Doc. 101;[2] Doc. 105], the Parties designated certain deposition testimony as evidence, subject to objections by other Parties, [Doc. 133; Doc. 95; Doc. 98; Doc. 130].  On October 31, 2023, this Court issued a ruling on the Parties' objections to certain deposition designations, as well as one remaining objection to Exhibit 168 that was offered at trial.  [Doc. 134].  The Court then ordered the Parties to supplement their proposed findings of fact and conclusions of law by December 15, 2023.  [Id.].  The Parties submitted their respective Supplemental Proposed Findings of Fact and Conclusions of Law on December 15, 2023.  [Doc. 135; Doc. 136; Doc. 137].[3]

---

[1] The Parties later agreed to proceed before the Court on all claims.  [Doc. 84].

[2] Marriott International has since filed a Motion to Correct Error in Joint Proposed Findings of Fact and Conclusions of Law ("Motion to Correct").  [Doc. 139].  In a Minute Order entered in conjunction with the instant Findings of Fact and Conclusions of Law, the Court denies the Motion to Correct.  See [Doc. 147].

[3] In two parallel filings, Marriott International also seeks to correct typographical and citation errors in its Post-Trial Findings of Fact and Conclusions of Law, [Doc. 136].  See generally [Doc. 138; Doc. 138-2; Doc. 142; Doc. 142-2].  Although Marriott International has not specifically requested leave to amend, see [Doc. 138; Doc. 142], in its Minute

**LEGAL STANDARD**

Rule 52 of the Federal Rules of Civil Procedure provides:

> In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

Fed. R. Civ. P. 52(a)(1).  The United States Court of Appeals for the Tenth Circuit has explained that "[t]he district court's findings of fact should be sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts, should indicate the legal standards against which the evidence was measured, and should be broad enough to cover all material issues."  *OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1203 (10th Cir. 2007) (cleaned up).  But the trial court need not undertake this task in excruciating detail; rather, the judge is required only to make brief, definite, pertinent findings and conclusions upon the contested matters. *See BNSF Ry. Co. v. Gallatin Fuels, Inc.*, No. 2:07-cv-147-CAB, 2008 WL 11335089, at *1 (D. Wyo. Dec. 3, 2008), *aff'd sub nom. Burlington N. Santa Fe Ry. Co. v. A 50-Foot Wide Easement Consisting of 6.99 Acres more or less*, 346 F. App'x 297 (10th Cir. 2009).

In Colorado, a plaintiff has the burden of proving its claims by a preponderance of the evidence.  *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1057 (Colo. 1992).  "Once a plaintiff establishes a prima facie case, the defendant may produce evidence to rebut

---

Order issued today, *see* [Doc. 147], the Court construes the Notice of Corrected Filing, [Doc. 138], and Notice of Second Corrected Filing, [Doc. 142], as motions for leave to amend Marriott International's Post-Trial Findings of Fact and Conclusions of Law, which the Court grants in part, to the extent that the new filings correct citation or typographical errors, and denies in part, to the extent that the filings seek to amend the Final Pretrial Order and withdraw a stipulation of fact or rely on evidence not admitted at trial.

the plaintiff's prima facie case, but the burden of proof or persuasion on the essential elements of the claim remains with the plaintiff.  *Id.* at 1057–58.

## FINDINGS OF FACT

### The Parties and their Representatives

1.      Interstate is a full-service disaster-recovery and property-restoration company with offices throughout the United States.  The company primarily serves North America but also completes projects outside the territorial U.S., such as the Caribbean.  [Doc. 101 at ¶ 1].

2.      Brett Conrad ("Mr. Conrad") is a Senior Vice President at Interstate.  [Doc. 101 at ¶ 12].

3.      In 2019, Ryan Porterfield ("Mr. Porterfield") was a Project Director for Interstate.  [Porterfield Dep. at 19:1–3].

4.      Marriott International owns, operates, franchises, and licenses lodging, including hotels and residential properties.  [Doc. 101 at ¶ 2; Tr. Ex. 36; Tr. Ex. 41].[4] Marriott International does its business directly and through many different subsidiaries.  [Doc. 101 at ¶ 4].  Specifically, subsidiaries of Marriott International own approximately 20 hotels.  [Doc. 126 at 524:3–6].[5]

---

[4] In their Joint Proposed Findings of Fact and Conclusions of Law, the Parties cite to certain deposition exhibits.  *See, e.g.*, [Doc. 101 at ¶ 2].  Where such exhibits were not admitted at trial, *see* [Doc. 120 at 2], the Court does not consider them, but instead relies on the Parties' stipulation of fact.

[5] This Court uses the convention [Doc.____] to refer to the docket number assigned by the District of Colorado's Electronic Court Files ("ECF") system and utilizes the page number assigned by the ECF system, except in cases of citing a transcript or a trial exhibit.  In citing either trial or deposition transcripts, the Court refers to the original page and line number.  When citing trial exhibits, the Court refers to the original page number, as opposed to the bates numbering used by the Parties.

5.      Marriott International and its subsidiaries also own 30 brands of hotels, and there are over 8,000 hotels worldwide that bear one of these brands ("Marriott-branded hotels").  [Doc. 101 at ¶ 5].  Sheraton Hotels & Resorts is one of these 30 brands.  [*Id.* at ¶ 6].

6.      Hector Mastrapa ("Mr. Mastrapa") is Marriott International's Senior Vice President for Risk Management.   [Doc. 101 at ¶ 11].   As of February 6, 2019, Mr. Mastrapa was Vice President Global Insurance and Safety Security.  [Doc. 126 at 514:23–25].

7.      Zurich American offers property and casualty insurance products to clients in the United States.  [Doc. 101 at ¶ 3].

8.      John Harmon ("Mr. Harmon") is an International Property Claims Supervisor.  [Doc. 126 at 709:21–22].

**Marriott International Property Insurance Program**

9.      All owners of Marriott-branded hotels must carry insurance.  [Doc. 101 at ¶ 6].   Owners can purchase insurance themselves, or certain owners can obtain insurance through a property insurance program that Marriott International offers to owners.  [Doc. 101 at ¶ 7].  Around 350 to 400 hotels participate in Marriott International's property insurance program, "with Zurich as the fronting carrier" under the program.  [*Id.* at ¶ 8; Doc. 77 at ¶ 3 (citing [Doc. 63-13 at ¶ 6; Doc. 63-14 at 238:15–240:18; Doc. 63 at ¶¶ 3, 7; Doc. 69 at ¶¶ 3, 7])].

10.     Marriott International is a named insured on the Policy with Zurich American.  [Tr. Ex. 3; Doc. 126 at 525:6–7].

11.     Zurich American utilizes Cunningham Lindsey and Sedgwick ("Sedgwick"), a third-party property insurance adjustment firm, to assist it in adjusting insurance claims filed by its insureds.  [Doc. 124 at 85:8–20; Doc. 125 at 464:9–15].

12.     David Buck ("Mr. Buck") is an executive general adjuster at Sedgwick who serves as an independent adjuster handling commercial losses nominated to the Marriott International property insurance program.  [Buck Dep. at 7:21–8:10; 9:3–6].  Individuals with the Risk and Insurance Department of Marriott International considered Mr. Buck the adjuster for the loss at the Hotel.  [Winffel Dep. at 56:3–5].

13.     Interstate is one of the preferred vendors for the Marriott International property insurance program and was also on the preferred vendor list with Zurich American.  [Doc. 101 at ¶ 10; Buck Dep. at 10:9–18; Zurich American 30(b)(6) Dep. at 213:16–214:3].

14.     Because of Interstate's long history with Marriott International's property-insurance program, Mr. Mastrapa and Mr. Conrad have a longstanding business relationship.  [Doc. 101 at ¶ 15; Doc. 126 at 540:8–10, 541:9–14].

15.     Mr. Buck's role as the agreed mutual nominated adjuster by Marriott International and Zurich American is to receive loss notices from properties that participate in the Marriott International property insurance program, investigate the cause of loss, investigate the damages, the repairs, the costs for those repairs, and make recommendations to both Marriott International and Zurich American on the policy and the damages from the investigation.  [Buck Dep. at 9:7–16].

16.     Mr. Buck is familiar with Interstate as a preferred vendor by Marriott International in the Marriott International property insurance program and as on a

preferred vendor list for Zurich American.  In that context, Mr. Buck has worked with Interstate for over ten years.  [Buck Dep. at 10:4–18].

**The Loss at Issue**

17.    The Sheraton Grand Rio Hotel & Resort is located at Av. Niemeyer, 121, Rio de Janeiro, Brazil (the "Hotel" or "the Sheraton") and participates in the Marriott International property insurance program.  [Doc. 101 at ¶ 9; Marriott International 30(b)(6) Dep. at 238:15–240:18; Tr. Ex. 82].

18.    Thus, the Hotel was insured by policies from Zurich American and non-party Zurich Minas Brasil Seguros S.A. ("Zurich Brazil").  [Doc. 77 at ¶ 4 (citing [Doc. 59-6; Doc. 59-13 at 108:2–25; Doc. 59 at ¶ 4; Doc. 67 at ¶ 4])].  The Property Loss Notice identified Marriott International as the insured.  [Tr. Ex. 4].

19.    On February 6, 2019, a mudslide caused millions of dollars' worth of damage at the Hotel.  [Doc. 101 at ¶ 16; Tr. Ex. 157 at 2].

20.    As of February 7, 2019, Mr. Mastrapa had been informed and believed that Marriott International "owned" the Hotel.  [Tr. Ex. 36; Tr. Ex. 41 at 1–2; Marriott International 30(b)(6) Dep. at 22:14–15, 23:22–24:1, 24:14–22].  Indeed, Mr. Mastrapa informed Marriott International executives Val Bauduin, Chief Accounting Officer; Leeny Oberg, Chief Financial Officer; and Brad Wood, Senior Vice President of Risk Management as of 2019, [Tr. Ex. 41; Doc. 126 at 598:21–599:22], of the loss at the Hotel and stated:  "This hotel is owned by Marriott thus my notice to you.  The hotel participates in Marriott's property insurance program. . . .  We have notified our claims adjusters and are presently identifying a restoration company to assist with clean up and building stabilization," [Tr. Ex. 41; Marriott International 30(b)(6) Dep. at 59:22–60:16].

21.     A day later, on February 8, 2019, Mr. Mastrapa called Mr. Conrad at Interstate to see whether Interstate "had capabilities to deploy resources" to handle the loss at the Hotel, and Mr. Conrad confirmed that Interstate did.  [Doc. 101 at ¶ 17; Marriott International 30(b)(6) Dep. at 30:25–31:15, 34:13–16].

22.     During the phone call, Mr. Conrad raised the concern that Interstate had previously had a dispute over payment for services rendered by Interstate at the Ritz Carlton in Puerto Rico and he wanted to make sure that Interstate did not get "burned" again.  [Doc. 125 at 355:11–20; Doc. 126 at 614:20–25].  Based on its weighing of the evidence and the credibility of the witnesses, this Court concludes that Mr. Mastrapa informed Mr. Conrad during that call that Marriott International had an ownership interest in the Hotel and that there would not be issues with Interstate's performing the work or being paid for the work.  *See, e.g.*, [Doc. 125 at 355:21–356:1].  Based on the record before the Court and the Court's assessment of the testimony at trial, the Court does not credit Mr. Mastrapa's testimony that "there was no request for a Marriott International assurance for payment."  [Doc. 126 at 614:20–615:2].

23.     Around this same time, Zurich American and Sedgwick were informed about the damage to the Hotel.  [Tr. Ex. 173].  Marriott International prepared and submitted a Property Loss Notice dated February 8, 2019, claiming "[d]amages due to torrential rains and surface water at the Sheraton Grand Rio Resort & Hotel in Rio de Janeiro, Brazil." [Tr. Ex. 4].

24.     Zurich American thereafter assigned a claims handler to monitor to the loss. [Doc. 101 at ¶ 27; Tr. Ex. 38 at 28–29; Zurich American 30(b)(6) Dep. at 65:8–66:9].

25.     A member of Marriott International's Risk Management Division contacted Mr. Buck about the loss at the Hotel on or about February 7, 2019.  [Buck Dep. at 11:8–19; 12:1–16].  Mr. Buck arrived in Brazil on or about February 27, 2019.  [*Id.* at 25:23–26:5].

**Interstate Response**

26.     Phase 1 of the Hotel Project was remediation of the Hotel, i.e., cleaning up the property and doing emergency repairs needed to make sure that no additional damage was done from leaving wet walls or mud in the sublevel.  [Winffel Dep. at 29:20–30:1].  Phase 2 was restoration and building back the Hotel.  [*Id.* at 30:2–4].

27.     Interstate's team began arriving in Brazil on February 9, 2019, the day after Mr. Mastrapa called Mr. Conrad.  [Doc. 101 at ¶ 26; Tr. Ex. 39].

28.     Sedgwick do Brazil Ltda. ("Sedgwick Brazil") served as Zurich Brazil's third-party administrator for the Hotel Project.  [Doc. 101 at ¶ 28].

**The AWO**

29.     After the phone call between Messrs. Conrad and Mastrapa, Mr. Conrad emailed Mr. Mastrapa an "Advanced Work Order" ("AWO") which Mr. Conrad had already signed on behalf of Interstate.  [Doc. 101 at ¶ 18; Tr. Ex. 7; Tr. Ex. 39; Tr. Ex. 40].  Mr. Conrad believed that the contract would be with Marriott International.  [Doc. 125 at 357:10–20].  That belief is reflected in his statement directed to Mr. Mastrapa on February 8, 2019, where he stated, "As always, the team here at Interstate is proud to serve you and your team in a time of need."  [Tr. Ex. 40 (emphasis added)].

30.     Upon receipt of the AWO, Mr. Mastrapa forwarded the document and said "[p]lease have the hotel GM [general manager] or DOF [director of finance] sign the attached contract and return to me so I can forward to the restoration company."  [Doc.

101 at ¶ 19]; Tr. Ex. 39 at 1].   Mr. Mastrapa also stated that "[t]hese expenses will be covered by the insurance policy."  [Doc. 101 at ¶ 20; Tr. Ex. 39 at 1].

31.    Ms. Sintia Gomes ("Ms. Gomes") was the General Manager at the Hotel. [Doc. 101 at ¶ 21; [Doc. 124 at 18:6–8; Doc. 125 at 360:14–15].

32.    Ms. Gomes was employed by a Brazilian entity called Companhia Palmares Hoteis e Turismo S.A. ("Companhia").  [Doc. 101 at ¶ 22].

33.    Companhia is an indirect subsidiary of Marriott International.  [Doc. 101 at ¶ 23; Tr. Ex. 8].  At least as late as May 21, 2019, Cathie Winffel of Marriott International Administrative Services, Inc. ("Ms. Winffel") confirmed to Mr. Buck that the Sheraton Rio Hotel & Tower was owned by Companhia, and that it was "owned by Marriott."  [Winffel Dep. at 17:10–18; Tr. Ex. 96].

34.    Ms. Gomes signed the AWO on the signature line for "Owner."  [Doc. 101 at ¶ 24; Tr. Ex. 7].  The AWO does not define the term "Owner," nor does it reference Companhia.   [Tr. Ex. 7].   But the AWO contains a section titled "Authority" that contemplates the existence of more than one "owner":

> As an additional inducement to Interstate, the undersigned represent(s) and warrant(s) to Interstate that he/she:  (i.) is the person properly authorized to enter into this Advanced Work Order; (ii.) is doing so on behalf of all owners of the Property/Project; (iii.) will communicate the contents of this Advanced Work Order, including representations made herein, to all owners of the Property and, by allowing Interstate to proceed with the Work, all owners hereby ratify this Advanced Work Order and terms contained herein.

[*Id.*].

35.    On February 8, 2019, Mr. Mastrapa emailed to Interstate the version of the AWO signed by Ms. Gomes, who Mr. Mastrapa identified as the "hotel GM."  [Doc. 101 at ¶ 25; Tr. Ex. 42; Tr. Ex. 148].  At that time, he represented that Ms. Gomes's email address was Sintia.Gomes@Marriott.com.  [Tr. Ex. 42; Tr. Ex. 148].

36.     The AWO reflects Project No. 2008-19-6169.   [Tr. Ex. 7].   The Work Description included in the AWO was "Mitigation, Drying and clean up of affected areas." [*Id.* at 1].

37.     With respect to payment, the AWO provides:

Owner agrees to pay, whether or not such Work is covered by insurance, Interstate for all labor, materials, and equipment utilized to perform the Work, which may include, without limitation, emergency services ("Emergency Work"), restoration, cleaning drying, water and sewer extraction, repair(s), removal, storage, testing, damage appraisal, and return of inventoried personal property ("Contents"), all repairs, renovations, and other mitigations and improvements to the building ("Structure"), (collectively, the "Work").

[Tr. Ex. 7 at 1].

38.     The AWO further states that "Emergency Work and/or Contents will be performed in accordance with Attachment B, which does not include applicable taxes, fees, or prevailing wage requirements, all of which will be invoiced separately."   [*Id.*].

39.     "Attachment B" of the AWO refers to Interstate Time and Materials Rate Schedule.   [Tr. Ex. 7].   However, there was no Attachment B appended to the AWO.   [*Id.*; Doc. 124 at 96:3–7; Doc. 126 at 290:3–13].   Instead, Mr. Porterfield provided Attachment B, [Tr. Ex. 2], to Marriott International and Mr. Buck on or about March 4, 2019. [Porterfield Dep. at 135:14–136:8; 140:11–14].   Attachment B's Material Rate Schedule provides that the hourly rate for Labor (GL) is $34.00; Restoration Laborer is $42.00; and Skilled Tradesman is $55.00.   [Tr. Ex. 2 at 1].

40.     The following types of laborers were considered within the category of Skilled Tradesmen:   drywaller (hanger, finisher, plasterer); painter; finish carpenter; flooring installer; trim installer.   [Porterfield Dep. at 154:6–21].

41.     No later than February 15, 2019, Mr. Porterfield, in his capacity as Project Director, began issuing Daily Field Reports for the work performed at the Hotel, including work performed on February 13, 2019.   [Tr. Ex. 50 at 2].   The Daily Field Report 02.13.2019 was sent to Marriott International employees, including Mr. Mastrapa.   [*Id.* at 1–2].

42.     Interstate issued Invoice 52362 for Project No. 2008-19-6169, for $1,000,000, on or around February 19, 2019.   [Doc. 101 at ¶ 29; Tr. Ex. 53].   "The invoice provides for an initial deposit to mobilize the team to the site and commence emergency operations to facilitate the recovery effort."   [Tr. Ex. 53 at 1].   Invoice 52362 for Project No. 2008-19-6169 is addressed to "Marriot[t] International Attn:  Amadou Njie 10400 Fernwood Road Bethesda, MD 20817-1102."   [*Id.*].   At the time, Amadou Njie ("Mr. Njie") was an employee of Marriott International's Risk and Insurance Department.   [Doc. 125 at 368:8–18].

43.     Along with Invoice 52362, Interstate issued a Scope Letter ("Emergency Services") dated February 14, 2019 (the "February 14 Scope Letter"), which referred to "Marriott International – Sheraton Grand Resort – Rio" and provided a scope of work that included "Initial Mobilization."   [Doc. 101 at ¶ 43; Tr. Ex. 53 at 2–4; Doc. 125 at 369:2–16].

44.     The February 14 Scope Letter refers to an "agreed upon Schedule of Rates that are attached."   [Tr. Ex. 53 at 5].   The February 14 Scope Letter, however, did not include a Schedule of Rates.   [*Id.*].

45.     The February 14 Scope Letter refers to an initial mobilization deposit of $1,000,000.   [Tr. Ex. 53 at 5].   Interstate concludes the February 14 Scope Letter with,

"[i]t has been **Interstate Restoration** [sic] pleasure to submit this proposal to Sintia Gomes with Marriott International – Sheraton Grand Rio."  [*Id.* (emphasis in original)].

46.    Invoice 52362 for Project No. 2008-19-6169 in the amount of $1,000,000 was paid.  [Doc. 124 at 135:11–136:11, 18–21, 137:4–5].

47.    In addition, Interstate issued a Scope Letter dated March 3, 2019 (the "March 3 Scope Letter").   [Tr. Ex. 63].   In transmitting the March 3 Scope Letter, Mr. Porterfield's naming convention refers to 2008-19-6169, the project number associated with the AWO.  *Compare* [Tr. Ex. 65; Tr. Ex. 66], *with* [Tr. Ex. 7].  The March 3 Scope Letter was shared with members of Marriott International's Risk and Insurance Department, including Ms. Winffel and Mr. Njie, [Doc. 101 at ¶ 30; Tr. Ex. 53; Tr. Ex. 65; Tr. Ex. 66], as well as Mr. Buck, [Tr. Ex. 65; Tr. Ex. 66].

48.    A Statement of Work Complete for Project No. 2008-19-6169 was executed by Ms. Gomes on April 19, 2019, and reflects "Marriott International" as Owner.  [Tr. Ex. 81].

49.    On or about May 31, 2019, Interstate issued Invoice No. 55180 for Project No. 2008-19-6169, associated with the AWO, in the amount of $3,500,760.51.  [Tr. Ex. 104].  The "Description of Work" states, "Second draw invoice for emergency services extraction, cleaning, demolition, drying, and bio-cleaning of all impacted areas as per the EMS scope letter."  [*Id.* at 1].  Despite being dated May 31, 2019, the invoice due date is reflected as May 29, 2019, and in other places, May 10, 2019.  [*Id.* at 2, 189].

50.    The supporting documentation to Invoice No. 55180 reflects travel, materials, equipment, and labor charges from February 7, 2019, to April 17, 2019.  *See generally* [*id.*].

**The NAWOs**

51.     Between February 26, 2019, and April 18, 2019, Interstate also executed four National Agreement Work Orders ("NAWOs") on a different Interstate form than the AWO.  [Doc. 101 at ¶ 32; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].

52.     Each of these NAWOs identifies "Marriott Int'l" along with the address of the Hotel as the "Project Name and Location," and is signed by Ms. Gomes.  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].

53.     Mr. Porterfield filled out each NAWO and presented them to Ms. Gomes at the Hotel.  [Doc. 101 at ¶ 37; Porterfield Dep. at 184:18–186:17, 188:3–9].

54.     Each NAWO is between "Interstate Restoration, LLC," and "Client/Owner." [Doc. 101 at ¶ 39; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].  Ms. Sintia Gomes signed for the "Client/Owner."  [Doc. 101 at ¶ 39; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79]. The term "Client/Owner" is not otherwise defined in any of the NAWOs.  [Doc. 101 at ¶ 39; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].

55.     Mr. Porterfield signed each NAWO as "National Project Director" for "Interstate Restoration, LLC," and Ms. Gomes signed as "General Manager" for "Client/Owner."  [Doc. 101 at ¶ 40; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].

56.     The NAWOs refer to a "National Account Agreement."  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].  No National Account Agreement exists between Interstate and Marriott International.  [Doc. 126 at 545:15–17].  Thus, there were no written payment terms pursuant to a National Account Agreement.  [Doc. 124 at 207:7–9].

57.     Interstate also sent subsequent Scope Letters dated February 18, 2019 ("February 18 Scope Letter"); March 1, 2019 ("March 1 Scope Letter"); March 3, 2019

("March 3 Scope Letter"); March 18, 2019 ("March 18 Scope Letter"); April 1, 2019 ("April 1 Scope Letter"); April 18, 2019 ("April 18 Scope Letter"); and May 1, 2019 ("May 1 Scope Letter").  [Doc. 101 at ¶ 43; Tr. Ex. 51; Tr. Ex. 62; Tr. Ex. 63; Tr. Ex. 72; Tr. Ex. 74; Tr. Ex. 77; Tr. Ex. 86].  In each of these Scope Letters, Interstate refers to the Project as "Marriott International – Sheraton Grand Resort – Rio") and to "Marriott International." *See* [Tr. Ex. 51; Tr. Ex. 62; Tr. Ex. 63; Tr. Ex. 72; Tr. Ex. 74; Tr. Ex. 77; Tr. Ex. 86].

58.   Each of the Scope Letters refers to an "agreed upon Schedule of Rates that are attached."  *See, e.g.*, [Tr. Ex. 51 at 10].  *See also* [Tr. Ex. 51; Tr. Ex. 62; Tr. Ex. 63; Tr. Ex. 72; Tr. Ex. 74; Tr. Ex. 77; Tr. Ex. 86].

### *February 26 NAWO*

59.   After the initial mudslide, and once Interstate was on site, there was a subsequent fire at the Hotel.  [Doc. 124 at 81:20–23; 112:24–113:3].

60.   The first NAWO, dated February 26, 2019, with Project No. 2008-19-6560, stated under "Description of Work":  "Complete Emergency Fire/Smoke Remediation for damage caused to" a list of units and corridors on the 16th and 17th floors of the Hotel (the "February 26 NAWO").  [Doc. 101 at ¶ 33; Tr. Ex. 59].

61.   Interstate issued the March 1 Scope Letter that reflects a Detailed Scope of Work that includes work on guest rooms and hallways on floors 16, 17, and 18 of the Hotel.  [Tr. Ex. 62 at 3–4].

62.   On or about May 31, 2019, Interstate issued Invoice No. 55154 in the amount of $69,068.71 for Project No. 2008-19-6560 with the description of "[e]mergency service fire mitigation on the 16th, 17th, and 18th floor as per the scope letter."  [Tr. Ex.

103]. Despite being dated May 31, 2019, the invoice due date is reflected as April 3, 2019. [*Id.* at 2].

63.     The supporting documentation to Invoice No. 55154 reflects Billable Labor Details, which include "General Laborers" and "Restoration Laborers" billed at hourly rates of $34.00 and $42.00, respectively.  *See, e.g.*, [Tr. Ex. 103 at 88–89, 93].

64.     The supporting documentation reflects materials, equipment, and labor charges for a period between February 26, 2019, to March 13, 2019.  [Tr. Ex. 103].

65.     A Statement of Work Complete for Project No. 2008-19-6560 was executed by Ms. Gomes on April 18, 2019, and reflects "Marriott International" as the "Owner."  [Tr. Ex. 76].

66.     Interstate has not been paid for the work reflected in the NAWO dated February 26, 2019.  [Doc. 124 at 113:24–114:1].

### *February 27 NAWO*

67.     The second NAWO, dated February 27, 2019, with Project No. 1008-19-6559, stated under "Description of Work":  "Complete Emergency Repairs of" various hotel areas that had needed "remediation . . . due to heavy rains and mud slide" (the "February 27 NAWO").  [Doc. 101 at ¶ 34; Tr. Ex. 61].

68.     On or about May 31, 2019, Interstate issued Invoice No. 55155 for Project No. 1008-19-6559 in the amount of $987,660.19.  [Tr. Ex. 102].  Invoice No. 55155 describes the work completed as:  "Phase 1 Emergency Repairs as directed by Marriott to make the damaged areas ready for soft opening and based upon our provided scope letter."  [Doc. 101 at ¶ 34; Tr. Ex. 102 at 2].

69.     The supporting documentation to Invoice 55155 for Project No. 1008-19-6559 reflects Billable Labor Details, which include "Drywall Installers" and General Laborers billed at hourly rates of $84.61 and $34.00, respectively, for the period between February 25, 2019, and April 26, 2019.  *See, e.g.*, [Tr. Ex. 102 at 4, 30].

70.     Invoice No. 55155 was paid in full.  [Doc. 124 at 117:14–22].

### *<u>March 14 NAWO</u>*

71.     The third NAWO, dated March 14, 2019, with Project No. 1008-19-6885, stated under "Description of Work":  "Complete Emergency Fire/Smoke Repairs for damage caused to" the same list of units and corridors on the 16th and 17th floors of the Hotel as the first NAWO, but with certain units crossed out (the "March 14 NAWO").  [Doc. 101 at ¶ 35; Tr. Ex. 68].

72.     On or about May 30, 2019, Interstate issued Invoice No. 55134 for Project No. 1008-19-6885 in the amount of $67,287.55.  [Tr. Ex. 100].  Invoice No. 55134 describes the work completed as:  "General contracting repairs after the fire mitigation services on the 17th floor as per the scope letter."  [*Id.* at 1].

73.     The supporting documentation to Invoice 55134 for Project No. 1008-19-6885 reflects Billable Labor Details, which include Drywall Installers and General Laborers billed at hourly rates of $84.61 and $34.00, respectively.  *See, e.g.*, [Tr. Ex. 100 at 4–5].

74.     A Statement of Work Complete for Project No. 1008-19-6885 was executed by Ms. Gomes on April 18, 2019, and reflects the Owner as "Marriott International."  [Tr. Ex. 75].

75.     As of March 28, 2019, the Hotel was able to re-open and Ms. Gomes was pleased with the workmanship of Interstate.  [Tr. Ex. 73].

### ***Bridge NAWO***

76.     The fourth NAWO, dated April 18, 2019, with Project No. 1008-19-7535, stated under "Description of Work":  "Complete all final Repairs of affected areas from storm damage" (the "Bridge NAWO"), [Doc. 101 at ¶ 36; Tr. Ex. 79].  The Bridge NAWO pertains to Phase 2 of the Hotel Project, and was considered a bridge contract until a formal contract could be put in place.  [Doc. 124 at 117:23–120:1].  Although the Bridge NAWO was dated April 18, 2019, it was not executed and returned to Interstate until June 3, 2019.  [Tr. Ex. 107].  When it was returned, representatives of Marriott International Risk and Insurance Department, including Ms. Winffel, Mr. Njie, and Marriott International Legal, were copied.  [*Id.*].

77.     Interstate issued a Scope Letter dated April 1, 2019, that includes details of work to be performed for "Phase 2 GC" repairs for guest rooms 1722 and 1723.  [Tr. Ex. 74].

78.     Interstate then issued a Scope Letter dated April 18, 2019, that includes details on work to be performed for "Phase 2 GC Repairs" for certain areas of the Hotel. [Tr. Ex. 77].

79.     Interstate subsequently issued a Scope Letter dated May 1, 2019, that includes details on work to be performed for "Phase 2 GC Repairs" for additional areas of the Hotel including the Bene Restaurant, Dry Martini Lounge, and Sheratoons.  [Tr. Ex. 86].

80.     On or about August 26, 2019, Interstate issued Invoice No. 57523 for Project No. 1008-19-7535 in the amount of $1,595,953.10.   [Tr. Ex. 115].   The "Description of Work" states:   "Phase 2 GC Repairs for work performed and managed by the Interstate team per the attached Scope Letter.  This invoice does not include the final repairs in the Bene, Dry Martini, or Sheratoons as well as any work to be performed by subcontractors."  [*Id.*].

81.     The face of Invoice No. 57523 indicates that "Payment due 10 days from invoice date."  [*Id.*].  But elsewhere, it reflects a due date of June 10, 2019.  [Doc. 124 at140:18–141:11; Tr. Ex. 116 at 196].

82.     The supporting documentation to Invoice No. 57523 reflects labor, materials, and equipment charges for the period between April 18, 2019, to June 10, 2019.  [Tr. Ex. 116].

83.     Interstate demobilized from the Hotel Project no later than June 2019.  [Doc. 126 at 587:12–14].

84.     While correspondence dated November 12, 2019, suggests that Zurich American approved a payment of $1.9 million, including "partial payment for [P]hase 2 activity (including Interstate invoice 7535),"[6] [Tr. Ex. 119 at 3], Interstate testified that it was not paid for the work performed under the Bridge NAWO, [Doc. 124 at 117:23–20:1]. Interstate determined which portions of invoices were paid based on wiring instructions. [Doc. 124 at 207:10–208:4].  Thus, this Court concludes that Interstate was not paid for any portion of invoice No. 57523 in the amount of $1,595,953.10.

---

[6] There is no Invoice No. 7535, but there is a Project No. ending in 7535, which corresponds to Invoice No. 57523.  *Cf.* [Tr. Ex. 115].

### *The RRC*

85.     On October 15, 2019, Interstate and Companhia executed a Remediation and Restoration Contract ("RRC"), which was intended to cover "Phase 2 of water damage repairs" at the Hotel.  [Doc. 101 at ¶ 41; Tr. Ex. 32 at 1–11].

86.     The RRC was signed by Mr. Porterfield on behalf of Interstate and by Horacio Giurno ("Mr. Giurno"), on behalf of Companhia.[7]  [Doc. 101 at ¶ 42; Tr. Ex. 32 at 11].  Ultimately, Interstate and Companhia did not go forward with the RRC, [Doc. 126 at 566:4–13], and none of the unpaid amounts claimed by Interstate arose under the RRC, which was not executed until October 2019,[8] [Tr. Ex. 53; Tr. Ex. 100; Tr. Ex. 102; Tr. Ex. 103; Tr. Ex. 104; Tr. Ex. 115].

## Actions by Zurich American

87.     Mr. Buck was identified as the lead adjuster for the Hotel loss, [Tr. Ex. 173 at 2], and was dispatched to Brazil to assist in the adjustment of the Hotel loss, [Buck Dep. at 25:23–26:5, 60:11–17, 126:12–24].

88.     On March 14, 2019, Mr. Buck issued a report to Marriott International, specifically Ms. Winffel; Mr. Njie; Beth Toth; and Kinsey Craig, regarding the loss at the

---

[7] Although Plaintiff and Marriott International stipulated to the signatory of the RRC as being Victoria Nogueira, an examination of the actual document reflects that it was signed by "Horacio Giurno, Director."  [Tr. Ex. 32 at 11].

[8] To the extent that Marriott International has requested the Court to reconsider its ruling with respect to an objection to certain deposition testimony by Mr. Porterfield raised solely in its Post-Trial Proposed Findings of Fact and Conclusions of Law, [Doc. 138-1 at 19 n.2 (First Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law); Doc. 142-1 at 19 n.2 (Second Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law)], this Court declines to do so.  Any request for reconsideration should have been raised through a formal motion, accompanied by legal analysis, in a timely fashion after the Court's Order dated October 31, 2023, not informally through a footnote.  Fed. R. Civ. P. 7(b).

Hotel ("March 14 Report").  [Tr. Ex. 70].  This same March 14 Report is copied to Zurich North America; Zurich Minas Brasil Seguros; Marsh USA; and Sedgwick Do Brasil, Ltda. [*Id.* at 1].  The scope of damage is identified in this March 14 Report to include varying degrees of damage, including:

- Elevators (12 lifts in total);
- Cold Rooms (2 rooms located on Zero Floor and 1 in Room Service);
- Pumps (3 pumps for drinking water; 3 for cold water, 3 for sewage, 4 for pools and filters);
- Heaters (3 units for swimming pools);
- Generators (2 units, 1 of 1,000 Kva and 1 of 500 Kva);
- Chillers (3 in total, on Ground Zero, being 1 of 450 Ton and 2 of 400 Ton);
- All restaurants (Bene, Dry Martini, Casa da Cachaça, Casarão, Salão Carioca and Room Service) and respective kitchens (civil, furniture, machinery and etc[.]);
- Swimming pools (4 in total, cleaning and repairs if needed);
- Outdoor furniture (pools area) and Gardening;
- Sheraton Kid's Club;
- General Electrical (Dist. Boxes, cabling and etc[.]);
- General Civil (Purchase Offices, Deposits, ThyssenKrupp Room, Paintings, Finishing and Coatings, Bathrooms and etc.);
- Back of the house;
- Food Stock (Kitchens, Cellars, Cold Room 5 / Dry food, berages, cold prods.).

[*Id.* at 4–5].

89.     Zurich American funded the claim by Marriott International with respect to the Hotel through Zurich Brazil.  [Doc. 127 at 784:10–21; Tr. Ex. 5].

90.     When Companhia requested that Interstate invoice Companhia instead of "Marriott International," Interstate agreed to do so.  [Doc. 101 at ¶ 31; Porterfield Dep. at

101:16–102:13; Tr. Ex. 98].  But there is no indication that Marriott International explained that it was not an owner of the Hotel at that time.  *See, e.g.*, [Tr. Ex. 83; Tr. Ex. 93].

91.     On page 1 of each Invoice, the "Bill To" entity is identified as "Cia Palmares De Hotels E Turismo," i.e., Companhia.  *See, e.g.*, [Tr. Ex. 103 at 1].  But on the following page, the "Bill To Information" references "Marriott International Sheraton Grand Rio." *See, e.g.*, [Tr. Ex. 103 at 2].

92.     After all of the work on Phase 1 and the Bridge NAWO had been completed, Sedgwick Brazil, Zurich Brazil, and Critério took issue with, among other things, the fact that Interstate had billed local Brazilian labor at higher United States labor rates.  [Doc. 101 at ¶ 45; Tr. Ex. 153 at 1; Tr. Ex. 9 at 29].

93.     Interstate utilized a vendor with local Brazilian connections, Restore Now, to facilitate the hiring of the skilled tradespeople.  [Porterfield Dep. at 51:6–18, 22–25, 52:1–15].  Interstate attempted to use a different entity, SAMCO, to provide labor but SAMCO could not match the same rates as Restore Now.  [*Id.* at 55:4–16; 57:1–12].

94.     Critério advised Zurich Brazil not to reimburse the Hotel for the full amount of Interstate's invoices because, according to Critério, the invoices were far above market value for Interstate's work; specifically, of the approximately $7.2 million that Interstate invoiced, Critério calculated the value of Interstate's labor under Brazilian rates at approximately $1.6 million.  [Doc. 101 at ¶ 46; Tr. Ex. 153 at 1; Tr. Ex. 9].

95.     Regarding the local laborers, Interstate's invoices charged two different "blended" hourly rates:  $34.00 for "unskilled" labor and $84.61 for "skilled" labor, with additional premiums for overtime and weekends.  [Doc. 101 at ¶ 47; Tr. Ex. 102 at 4–5; Tr. Ex. 100 at 3–4].

96.     Interstate first communicated with Zurich American regarding payment of its invoices on November 12, 2019, after the dispute about applicable labor rates arose in Brazil.   [Doc. 101 at ¶ 48; Tr. Ex. 119].    Representatives of Interstate, Marriott International, and Zurich American subsequently engaged in communication in an attempt to resolve the disputes.  *See, e.g.*, [Tr. Ex. 135].

97.     Zurich Brazil ultimately agreed to an hourly rate of $34.00 for all local laborers, which resulted in a reduction of approximately $1.35 million from the original amounts Interstate invoiced, and also agreed to "consider[]" an additional $1 million for vendors and subcontractors, subject to Interstate's providing additional information.  [Doc. 101 at ¶ 49; Tr. Ex. 153 at 1].

98.     As of February 2020, Mr. Njie of Marriott International indicated that "[w]e have requested an additional advance from Zurich to pay Interstate the difference up to $4,073,985.67.  We will issue the additional payment as soon as we receive the advance." [Tr. Ex. 135 at 1].   Mr. Njie's signature block indicates that he is "Director, Insurance Placement, Marriott International, Inc."  [*Id.*].

99.     At that time, Interstate had been paid for all of its own Billable Labor & Fees; Materials and Consumables; Equipment and Tools; and Reimbursable Items.   [*Id.*]. However, the Parties continued to have a dispute over payments for subcontractors, vendors, and local vendors.  [*Id.*].

100.    Representatives of Interstate, Marriott International, and Zurich American continued to work together to find a resolution to the billing dispute.  *See, e.g.*, [Tr. Ex. 128; Tr. Ex. 129; Tr. Ex. 136; Tr. Ex. 146].  To that end, Interstate continued to respond

to inquiries from Marriott International and Zurich American and provide back up with respect to particular invoices. *See, e.g.*, [Tr. Ex. 117].

101.   In June 2020, Sedgwick adjusted for the $34/hour rate listed on Interstate's agreed pricing schedule with Marriott International, allowing for a revised adjustment of $4,552,574.67 from the previous $4,073,985.23, an $478,589.44 increase.  [Tr. Ex. 146 at 2].

102.   No additional payments were made.  The dispute concerning payment of Interstate's invoices met an impasse around September 2020, when Interstate demanded payment of its invoices in full, to no avail.  [Doc. 101 at ¶ 50; Zurich American 30(b)(6) Dep. at 196:3–198:22].

103.   In all, Interstate submitted six invoices for its work, totaling $7,220,730.06. [Tr. Ex. 53; Tr. Ex. 100; Tr. Ex. 102; Tr. Ex. 103; Tr. Ex. 104; Tr. Ex. 115].

| Invoice | Date | Amount | Description | Job | Ex |
|---------|------|--------|-------------|-----|-----|
| 52362 | 2/19/19 | $1,000,000.00 | "Emergency response to water damage to the building due to mudslide and rain.  The invoice provides for an initial deposit to mobilize the team to the site and commence emergency operations to facilitate the recovery effort." | 2008-19-6169 | 53 |
| 55134 | 5/30/19 | $67,287.55 | "General contracting repairs after the fire mitigation services on the 17th floor as per the scope letter." | 1008-19-6885 | 100 |
| 55180 | 5/31/19 | $3,500,760.51 | "Second draw invoice for emergency services extraction, cleaning, demolition, drying, and bio-cleaning of all impacted areas as per the EMS scope letter." | 2008-19-6169 | 104 |
| 55154 | 5/31/19 | $69,068.71 | "Emergency service fire mitigation on the 16th, 17th, | 2008-19-6560 | 103 |

| Invoice | Date | Amount | Description | Job | Ex |
|---------|------|--------|-------------|-----|-----|
| | | | and 18th floor as per the scope letter." | | |
| 55155 | 5/31/19 | $987,660.19 | "Phase 1 Emergency Repairs as directed by Marriott to make the damaged areas ready for soft opening and based upon our provided scope letter." | 1008-19-6559 | 102 |
| 57523 | 8/26/19 | $1,595,953.10 | "Phase 2 GC Repairs for work performed and managed by the Interstate team per the attached Scope Letter.  This invoice does not include the final repairs in the Bene, Dry Martini, or Sheratoons as well as any work to be performed by subcontractors." | 1008-19-7535 | 115 |

104.   To date, Interstate has received payment for $4,552,574.67 of the $7,220,730.06 that it invoiced for its work restoring the Hotel.  [Doc. 101 at ¶ 51].  The unpaid principal amount of Interstate's invoices is therefore $2,668,155.39.  [*Id.*].

105.   Of the unpaid principal, Zurich American refused to reimburse $1,304,948.94 based on inadequate documentation.  [Tr. Ex. 135].  The remainder, i.e., $1,363,206.45, is attributable to Zurich American's determination that the skilled tradesmen rate charged by Interstate far exceeded the local Brazilian rate for such work. [*Id.*].

## CONCLUSIONS OF LAW

1.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the Parties are diverse and the amount in controversy exceeds $75,000.

2.      The Court has personal jurisdiction over Marriott International and Zurich American, and venue is proper in the United States District Court for the District of Colorado.

3.      The Court applies the substantive law of Colorado to the analysis of the three causes of action here.  *See Edens v. The Netherlands Ins. Co*., 834 F.3d 1116, 1120 (10th Cir. 2016) ("In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims."  (cleaned up)).

I.      **Count I:  Interstate's Breach of Contract Claim Against Marriott International**

4.      To prove breach of contract under Colorado law, a plaintiff must establish (1) the existence of a contract, (2) performance of the contract by the plaintiff, (3) breach of a material term of the contract by the defendant, and (4) resulting damages.  *See Dorsey & Whitney LLP v. RegScan, Inc.*, 488 P.3d 324, 334 (Colo. App. 2018); *see W. Distrib. Co.*, 841 P.2d at 1058.

A.      **Existence of a Contract**

5.      "To determine if . . . contracts should be integrated, courts in Colorado have considered the following factors:  (1) whether the contracts expressly incorporate each other; (2) whether the contracts reference each other; (3) whether the contracts have separate and distinct consideration; and (4) whether the contracts have separate and distinct performance obligations."  *In re Centrix Fin., LLC*, 434 B.R. 880, 884 & n.2 (Bankr. D. Colo. 2010) (collecting cases).

6.      Upon review of the record, the Court construes the AWO and the first three NAWOs as an integrated contract (collectively, the "Phase 1 Contract") and the Bridge NAWO as a separate contract under Colorado law, which results in the application of different contractual terms in certain circumstances.

26

7.      As to the Phase 1 Contract, the AWO identifies the Project Name as "Sheraton Grand Rio Hotel & Resort," and authorizes Interstate to mobilize, commence, and perform mitigation, drying, and cleanup of affected areas of the Hotel.  [Tr. Ex. 7]. The first three NAWOs further define what work will be performed within the mobilization, commencement, mitigation, drying, and clean-up.  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68].

8.      While the AWO and the first three NAWOs do not specifically refer to each other, the defined Descriptions of Work for the first three NAWOs fall squarely within the AWO's defined scope of work of "Mitigation, Drying, and cleanup of affected areas."  [Tr. Ex. 7].  The Description of Work for the February 26 NAWO details "Complete Emergency Fire/Smoke Remediation for damage caused to unit 1721, 1722, 1723, 1724, 1725, 1726, 17th floor corridor, 1620, 1621, 1623, 1624, 1625, 1626, and 16th floor corridor."  [Tr. Ex. 59].  The Scope of Work for the March 14 NAWO is substantially similar to and interrelates with the February 26 NAWO, with certain units eliminated.  [Tr. Ex. 68].  The February 27 NAWO reflects a Description of Work of:

> Complete Emergency Repairs of Carioca Event Area, Casa de Cachaça Restaurant, Casa de Cachaça Bathrooms, Casa de Cachaça Storage Area, Pizzeria, Fire Pit Area, Casarão, Grounds Area, Bene, Dry Martini, Room Service A & B, Maintenance, Mechanical, and Garage Office Spaces. These areas had remediation performed due to heavy rains and mud slide.

[Tr. Ex. 61].

9.      In addition, Mr. Wenstrom testified that the NAWOs were "used as a refinement or some kind of delineation within [a] contract," but not considered separate contracts.  [Doc. 124 at 111:24–112:9].  Although there are different project numbers associated with the AWO and the first three NAWOs, each pertains to a singularly identified Project Name, i.e., the Sheraton Grand Rio Hotel & Resort.  *Compare* [Tr. Ex.

7], [Tr. Ex. 59], [Tr. Ex. 61], *and* [Tr. Ex. 68].  Project numbers are used as internal locators for Interstate, rather than to distinguish separate contracts.  [Doc. 124 at 113:8–17].

10.     Additional Scope Letters further defined the work to be performed within the scope of the Phase 1 Contract.  For instance, the February 14 Scope Letter provided a scope of work that included "Initial Mobilization," as contemplated by the AWO.  [Tr. Ex. 53 at 2–4].  Similarly, the March 1 Scope Letter specifically refers to work to be done on guest rooms 1722 and 1723, as well as guest rooms 1622, 1623, 1624, 1625, 1627, 1721, 1724, 1725, 1726, 1727, and 1728, and guest hallways on the 16th, 17th, and 18th floors, which corresponds with the Description of Work outlined in the February 26 NAWO. *Compare* [Tr. Ex. 62 at 3–4], *with* [Tr. Ex. 59].

11.     Thus, this Court concludes that the AWO and the first three NAWOs should be construed as an integrated contract under Colorado law.

12.     For its part, The Bridge NAWO reflects a Description of Work of "Complete all final Repairs of affected areas from storm damage."  [Tr. Ex. 79].  This NAWO pertained to Phase 2 of the Hotel Project, and it was considered a "bridge" contract while the RRC was being prepared.  [Doc. 124 at 118:6–20, 192:6–25; Tr. Ex. 105].

13.     Marriott International directed Ms. Gomes to sign the Bridge NAWO because the RRC was still with its Legal Department and it wanted Interstate to continue work on the Hotel.  [Tr. Ex. 105; Doc. 124 at 192:6–21].  Although the NAWO is dated April 18, 2019, the document was not returned to Interstate until June 3, 2019.  [Tr. Ex. 169].

14.     The RRC was not executed by Interstate and Companhia until October 15, 2019.  [Tr. Ex. 32].  Interstate did not perform work under the RRC.  [Doc. 124 at

194:11–22].  Therefore, the Court finds that the RRC is not an operative contract for this action.

15.    Accordingly, the Court concludes that the Bridge NAWO constitutes a separate contract relating to Phase 2 of the Hotel Project.  However, for the reasons set forth below, this Court finds that Interstate has established, by a preponderance of the evidence, that the Bridge NAWO was subject to the same course of conduct as the Phase 1 Contract.

16.    The Court next considers who the parties are to the Phase 1 Contract and the Bridge NAWO, respectively.  "The parties' intent is primarily determined from the language of the instrument itself."  *French v. Centura Health Corp.,* 509 P.3d 443, 449 (Colo. 2022) (citing *Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000)).

17.    A court must "first establish whether the provisions of the parties' agreement are ambiguous . . . by examining the instrument's language and construing that language in harmony with the plain and generally accepted meaning of the words employed."  *Id.*  If the contract "is complete and free from ambiguity," the court should "deem it to express the parties' intent and enforce it according to its terms."  *Id.*  If the "terms are susceptible of more than one reasonable interpretation, however, then the terms are ambiguous, and evidence beyond the four corners of the contract is admissible to establish the parties' intent."  *Id.*  "The mere fact that the parties disagree as to the proper interpretation of a contract does not itself establish an ambiguity in the contract."  *Id.*

18.    "A fundamental rule of contract law is that the court should strive to ascertain and effectuate the mutual intent of the parties."  *Powder Horn Constructors,*

*Inc. v. Florence*, 754 P.2d 356, 365 (Colo. 1988).   The intent of the parties "may be determined by reference to separate ancillary instruments."  *Id.*

19.     The Phase 1 Contract does not define "Owner."  [Tr. Ex.7; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 75].  However, the AWO specifically provides:

> Authority.  As an additional inducement to Interstate, the undersigned represent(s) and warrant(s) to Interstate that he/she:  (i.) is the person properly authorized to enter into this Advanced Work Order; (ii.) is doing so on behalf of <u>all owners of the Property/Project</u>; (iii.) will communicate the contents of this Advanced Work Order, including representations made herein, to all owners of the Property and, by allowing Interstate to proceed with the work, <u>all owners hereby ratify this Advanced Work Order and terms contained herein</u>.

[Tr. Ex. 7 at 1 (emphasis added)].

20.     Ms. Gomes does not identify her title under her signature of the AWO.  [Tr. Ex. 7 at 1].  The first three NAWOs identify "Marriott Int'l" as part of the "Project Name" and "Marriott International" as the "Company Name."  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68].  Ms. Gomes identifies herself as "General Manager" in each of the NAWOs.  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68].

21.     The Bridge NAWO also identifies "Marriott Int'l" as part of the "Project Name" and "Marriott International" as the "Company Name," and is signed by Ms. Gomes.  [Tr. Ex. 79].

22.     This Court concludes that both the Phase 1 Contract and Bridge NAWO are ambiguous as to the "Owner," or "owners," of the Hotel and thus, the party or parties to the contracts with Interstate.  Accordingly, this Court looks to evidence beyond the four corners of the contracts to establish the parties' intent.

23.     In Colorado, "[a]n agent can make his principal responsible for his actions if he is acting pursuant to . . . apparent authority, regardless of whether the principal has knowledge of the agent's conduct," *State Farm Mutual Auto. Ins. Co. v. Johnson*, 396

P.3d 651, 655 (Colo. 2017) (quoting *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994)), and even if "the conduct is not within the scope of [the agent's] employment," *Carl's Italian Rest. v. Truck Ins. Exch.*, 183 P.3d 636, 641 (Colo. App. 2007). "When an agent acts 'within his apparent authority' and contracts on behalf of his principal, the principal is liable on the contract." *People v. Romero*, 745 P.2d 1003, 1009 (Colo. 1987) (quoting *People v. Manning*, 672 P.2d 499, 506–07 n.8 (Colo. 1983)).

24.     An agent acts with apparent authority "when the third party reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal." *Johnson*, 396 P.3d at 656 (citing Restatement (Third) of Agency, § 2.03 (Am. Law Inst. 2006)).

25.     Apparent authority is created by the principal's "written or spoken words or other conduct . . . which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him." *Lucero v. Goldberger*, 804 P.2d 206, 209 (Colo. App. 1990). Thus, this Court focuses on the actions of Marriott International.

26.     While this Court does not find an oral contract arising from the February 8 conversation between Mr. Mastrapa and Mr. Conrad, it does conclude that during that conversation, Mr. Mastrapa represented to Interstate that the Hotel was "owned" in some manner by Marriott International.

27.     This conclusion is bolstered by internal communications within Marriott International at the time of the initial AWO on February 7, 2019, in which Jose Gonzalez confirmed to Mr. Mastrapa that "it was the Sheraton Grand Rio and we do own the hotel."

[Tr. Ex. 36].  In turn, Mr. Mastrapa provided notice of the loss to upper management at Marriott International because "[t]his hotel is owned by Marriott."  [Tr. Ex. 41 at 2].

28.     Mr. Mastrapa conceded during his deposition as the corporate designee of Marriott International that, at a minimum, he believed that the National Agreement Work Order dated February 26, 2019, [Tr. Ex. 59], was a contract between Interstate and Marriott International, [Doc. 126 at 583:16–25; Marriott International 30(b)(6) Dep. at 41:8–24].

29.     In addition to informing Interstate that Marriott International had an ownership interest in the Hotel, Mr. Mastrapa conveyed the executed AWO to Interstate from Ms. Gomes.  [Tr. Ex. 42].

30.     Each of the subsequent NAWOs names "Marriott Int'l" within the Project Name and "Marriott International" as the "Company Name."  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 75].

31.     There is also no evidence in the record that Marriott International ever informed Interstate that Marriott International did not have any ownership interest in the Hotel.  *See, e.g.*, [Winffel Dep. at 36:15–37:9].  Mr. Buck directed his March 14 Report to Marriott International.  [Tr. Ex. 70].  In May 2019, Ms. Winffel informed Mr. Buck that the Hotel was "owned by Marriott."  [Tr. Ex. 96].  Although Mr. Mastrapa testified that after Interstate initially invoiced Marriott International, he immediately notified Interstate that Marriott International was not the correct party to the contract, [Doc. 126 at 615:3–11], this testimony is inconsistent with Mr. Mastrapa's repeatedly informing others internally that Marriott International owned the Hotel, for instance, in November 15, 2019, [Tr. Ex. 124 at 2 ("we own the hotel")], and as late as April 21, 2020, [Tr. Ex. 136 at 3 ("[T]his is

an opened hotel so having these delays is a poor reflection on *our program*." (emphasis added))].

32.     All of these actions were being taken against the backdrop of exigent circumstances, during high season for the Hotel with many conventions booked, just weeks prior to Carioca Carnival with hotel occupancy close to 100%.  [Doc. 127 at 802:25–803:1; Tr. Ex. 42; Tr. Ex. 70 at 5; Tr. Ex. 73].

33.     Taking the record as a whole, this Court concludes that Interstate reasonably interpreted Ms. Gomes as acting on behalf of Marriott International and that Marriott International was an "Owner" as identified in, and a party to, both the Phase 1 Contract and the Bridge NAWO based on the actions and omissions on the part of Marriott International.  Thus, both the Phase 1 Contract and the Bridge NAWO are between Interstate and at least Marriott International.

**B.     Performance by Plaintiff**

34.     Interstate completed all of the work contemplated by the Phase 1 Contract. [Tr. Ex. 75; Tr. Ex. 76; Tr. Ex. 81].  Ms. Gomes indicated that she thought that Interstate did "an amazing job."  [Tr. Ex. 73].  At trial, Mr. Mastrapa could not identify any basis to criticize the quality of Interstate's work.  [Doc. 126 at 588:14–18].

35.     In addition, all of Interstate's work on the Hotel was completed (including with respect to the Bridge NAWO) and invoiced before the RRC was ever signed.  [Doc. 126 at 587:18–21].

36.     Therefore, this Court further concludes that Interstate has performed under the Phase 1 Contract and the Bridge NAWO.

### C.     Material Breach of Contractual Terms

37.     Next, the Court considers whether there has been a material breach of the Phase 1 Contract and the Bridge NAWO, respectively.

38.     As set forth above, *see supra* ¶ 105, Marriott International withheld payment to Interstate based on (1) Zurich American's determination that the skilled tradesmen rate charged by Interstate far exceeded the local Brazilian rate for such work, and (2) inadequate documentation.

39.     First, the Court finds that Marriott International breached the terms of the Phase 1 Contract and the Bridge NAWO by refusing to pay Interstate because Zurich American disagreed with the rate Interstate charged for skilled tradesmen.

40.     Marriott International contends, *inter alia*, that there can be no breach of contract because the AWO and the four NAWOs do not include payment terms and Marriott International never agreed to the rate for skilled tradesmen as set forth in the GC Time and Materials Rate Schedule, [Tr. Ex. 1].  *See* [Doc. 142-1 at 42–45].

41.     The AWO expressly provides that:

Owner agrees to pay, whether or not such Work is covered by insurance, Interstate for all labor, materials, and equipment utilized to perform the Work, which may include, without limitation, emergency services ("Emergency Work"), restoration, cleaning, drying, water and sewer extraction, repair(s), removal, storage, testing, damage, appraisal and return of inventoried personal property ("Contents"), all repairs, renovations, and other mitigations and improvements to the building ("Structure"), (collectively, the "Work.").

[Tr. Ex. 7 at 1].

42.     The AWO further provides that "Owner . . . agrees not to withhold payment for Work substantially completed."  [Tr. Ex. 7 at 2].

43.    The face of the NAWOs do not contain any payment terms.  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].  However, each of them reflects "T&M Rate Schedule per the Agreement."  [Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].

44.    While a court may not enforce a contract where there is none, *Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960); *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001), a contract will not fail for indefiniteness if missing terms can be supplied by law, presumption, or custom, *see Winston Fin. Grp., Inc. v. Fults Mgmt.*, Inc., 872 P.2d 1356, 1358 (Colo. App.1994).

45.    Indeed, Colorado law "does not require precise terms related to payment to prove the formation of a valid contract."  *See Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019).  "Besides the actual language of the documents, the existence of a contract may also be inferred from circumstantial evidence of the parties' conduct rather than in any explicit set of words."  *Id.* at 767 (quotation omitted) (citing *Agritrack Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1193 (Colo. 2001)).

46.    Here, although there are no payment terms on the face of either the Phase 1 Contract or the Bridge NAWO, the record before the Court demonstrates a course of conduct by Interstate and Marriott Interstate that is sufficient to supply the rate for skilled tradesmen of $84.61 as to each contract.

47.    First, the Court finds that based on the record before it, the very nature of remediation after a natural disaster, including the mudslide at issue with respect to the Hotel, is exigent and Marriott International recognized the value of mobilizing quickly. *See, e.g.*, [Tr. Ex. 42].  Therefore, it was the custom of this Hotel Project, and expectation

of the parties to the Phase 1 Contract and the Bridge NAWO, that Interstate would perform work even while formal documentation was being completed and executed.

48.     The record demonstrates that the custom in this Hotel Project was for Interstate to set forth labor rates in Rate Schedules for the Phase 1 Contract, a custom that continued through the Bridge NAWO.  [Doc. 124 at 62:2–63:23].  Attachment B, [Tr. Ex. 2], is referred to in the AWO and had been used by Interstate in prior losses under the Marriott Insurance Program.  *See* [Doc. 124 at 62:17–21].  Interstate also used a General Contractor Time and Material Schedule, which includes a rate of $84.61 for drywallers.  [Tr. Ex. 1].

49.     Representatives of Marriott International were copied on Scope Letters and spreadsheets reflecting the anticipated burn rate and vendor information.  *See, e.g.*, [Tr. Ex. 64; Tr. Ex. 65].

50.     Mr. Porterfield also provided Mr. Buck subcontractor rates from Attachment B and the General Contractor Time and Materials Schedule no later than March 2019. [Porterfield Dep. at 117:17–25; Buck Dep. at 151:3–25].  Mr. Mastrapa admitted during his deposition as Marriott International's corporate designee that Mr. Buck approved the rates with respect to the Hotel.  [Doc. 126 at 581:3–21; Marriott International Rule 30(b)(6) Dep. at 209:24–210:2].

51.     Because Marriott International did not want Interstate to think that it was no longer interested in having Interstate execute Phase 2, it directed Ms. Gomes to execute the Bridge NAWO.  [Tr. Ex. 105 at 2].  Specifically, Xavier Navas, Development Asset Management, The Americas for Marriott International, proposed that approach, to which Mr. Giurno, who ultimately executed the RRC, agreed.  [*Id.* at 1–2].  Ms. Winffel and Mr.

Njie were copied on the correspondence, and there is no evidence in the record that either individual objected to the approach.  [*Id.*].

52.    From the correspondence between the Parties and within Marriott International, this Court concludes that all Parties understood that they would continue in a manner consistent with the Phase 1 Contract through the Bridge NAWO while the RRC was being prepared.  [Tr. Ex. 107].  Indeed, no later than April 28, 2019, Mr. Porterfield provided Marriott International, through Mr. Buck and Criterio Experts, the Brazilian company used to assist in the adjustment of the insurance claim, information regarding the scope, vendors, and pricing for Phase 2—along with Phase 1.  [Tr. Ex. 89 at 2–3].

53.    The record demonstrates that, with respect to the Hotel for both the Phase 1 Contract and the Bridge NAWO, Interstate was paid rates that Mr. Buck approved because Marriott International was "happy to acquiesce" to those rates.  [Doc. 126 at 578:9–21].  Indeed, in this case, Interstate was paid the rate of $84.61 for skilled laborers in conjunction with Invoice No. 55155 related to the Phase 1 Contract.  [Doc. 124 at 138:15–139:13].

54.    There is no evidence in the record that Ms. Gomes or any representative of Marriott International's Risk and Insurance Department challenged any aspect of the information or estimates that they received during the execution of the work on the Hotel for either the Phase 1 Contract or the Bridge NAWO.  Nor is there evidence in the record that Marriott International sought to re-negotiate the course of conduct with Interstate before entering the Bridge NAWO.  Instead, the record demonstrates that Marriott International and Ms. Gomes wanted Interstate to continue its work into Phase 2.  *See, e.g.*, [Tr. Ex. 107].

55.     Accordingly, this Court concludes that the rate of $84.61 is the proper contractual rate for skilled laborers associated with the Hotel Project, and that Marriott International breached the Phase 1 Contract and the Bridge NAWO by withholding payment to Interstate at such rate for skilled tradesmen.

56.     In addition, this Court finds that Marriott International breached the Phase 1 Contract and the Bridge NAWO by withholding payment on the basis of inadequate documentation.   Upon review of the Phase 1 Contract and the Bridge NAWO, respectively, there is no contractual provision for Interstate to provide the Hotel or Marriott International a certain type of documentation, or to provide detailed subcontractor rates. *See* [Tr. Ex. 7; Tr. Ex. 59; Tr. Ex. 61; Tr. Ex. 68; Tr. Ex. 79].

57.     Nor is there any evidence that Interstate and Marriott International or the Hotel incorporated any documentation requirements from Zurich American or Zurich Brazil into their contractual relationship.

58.     The documentation across invoices is consistent across all invoices.   *See* [Tr. Ex. 100; Tr. Ex. 102; Tr. Ex. 103; Tr. Ex. 104; Tr. Ex. 115; Tr. Ex. 116].

### D.     Resulting Damages

59.     It is undisputed that to date, Interstate has received payment for $4,552,574.67 of the $7,220,730.06 that it invoiced for its work restoring the Hotel.  [Doc. 101 at ¶ 51].   The total unpaid principal amount of Interstate's invoices is therefore $2,668,155.39.  [*Id.*].  This Court concludes that Interstate has been damaged in the total amount of unpaid invoices:  $2,668,155.39.   *Cf. Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1231 (Colo. App. 2000) ("The amount of damages

awarded for a breach of contract cannot be based on speculation or conjecture; rather, it must be established with reasonable certainty by a preponderance of the evidence.").

60.    The Court concludes that this unpaid principal is properly subject to 2% monthly interest, which accrued no later than September 30, 2020, when Interstate made a final demand for full payment that was denied.  *See* [Doc. 101 at ¶ 50].  The AWO provides that "Owner agrees to pay interest at the maximum lawful interest rate or two percent (2%) a month, whichever is lower upon all amounts due, as well as reasonable costs and attorneys' fees incurred by Interstate in and enforcement of collection of the same."  [Tr. Ex. 7 at 1].  This interest rate, the Court concludes, carries through both the Phase 1 Contract and the Bridge NAWO, given the Court's finding that the Bridge NAWO was subject to the same course of conduct as the Phase 1 Contract.  *See, e.g.*, *supra* ¶¶ 15, 51, 54.

61.    Interstate is also entitled to reasonable attorney's fees incurred in collecting the amounts due under both the Phase 1 Contract and the Bridge NAWO.  [Tr. Ex. 7 at 1].  Although only the AWO provides for attorney's fees, *see* [*id.*], the provision controls both the Phase 1 Contract and the Bridge NAWO, as this Court has concluded that Plaintiff and Marriott International agreed to continue the terms from the Phase 1 Contract to the Bridge NAWO.[9]

---

[9] Even if the Court were to find that the attorney's fees provision did not carry through to the Bridge NAWO, the Court would award Interstate its attorney's fees incurred in pursuing recovery under the Bridge NAWO because the Court finds, in its discretion, that Interstate's claims for breach of contract based on the Phase 1 Contract and Bridge NAWO are so intertwined factually as to make it impossible to apportion the fees involved. *Cf. Mower v. Century I Chevrolet, Inc.*, No. 02-cv-01632-M, 2006 WL 2729265, at *24 (D. Colo. 2006) (applying Colorado law and observing that where attorney's fees incurred on intertwined claims are not severable, a court may award attorney's fees for time spent on all claims); *Cnty. Line Inv. Co. v. Tinney*, 936 F.2d 582, at *3 (10th Cir. 1991) (Table);

## II.     Interstate's Unjust Enrichment Claim Against Marriott International

62.     Unjust enrichment is a claim in quasi-contract based on principles of restitution, but is designed for circumstances where other remedies are unavailable.  *See W. Ridge Grp., LLC v. First Tr. Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (citing *DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 118 (Colo. 1998)).

63.     Having found an express contract between Interstate and Marriott International through the apparent authority of Ms. Gomes, Interstate's claim for unjust enrichment is moot and this Court does not pass on it.  *See id.* (citing *Interbank Invs., LLC v. Eagle River Water & San. Dist.*, 77 P.3d 814, 819 (Colo. App. 2003)).

## III.    Interstate's Intentional Interference with Contract Claim Against Zurich American

64.     Under Colorado law, a claim for intentional interference with contract has five elements:   "(1) existence of a contract between the plaintiff and a third party; (2) knowledge of that contract by the defendant; (3) the defendant's intentional, improper interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff."  *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 171 F. Supp. 3d 1092, 1120 (D. Colo. 2016) (citing, *inter alia*, *Colo. Nat'l Bank of Denver v. Friedman*, 846 P.2d 159, 170 (Colo. 1993)).

65.     To establish liability for intentional interference with contract, a plaintiff must also prove that the defendant's interference was improper.  *Warne v. Hall*, 373 P.3d 588, 595 (Colo. 2016) ("A plaintiff cannot be entitled to relief on a claim of intentional

---

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 980 (10th Cir. 1990). Given that these claims are indivisible, recovery of all reasonable fees in pursuing these claims against Marriott International is justified.  *Cf. Tinney*, 936 F.2d at *3.

interference with contract unless he alleges and proves that the defendant intentionally and improperly induced a party to breach the contract or improperly made it impossible for a party to perform.").

66.     The Colorado Supreme Court has "never attempted to rigidly define 'improper' for all purposes of interference with contract," *id.*, and the question "depends on the facts of each case," *Watson v. Settlemeyer*, 372 P.2d 453, 456 (1962).

67.     As such, Colorado courts consider the factors listed in the Restatement (Second) of Torts § 767 to determine whether interference is improper:

    a) the nature of the actor's conduct,

    b) the actor's motive,

    c) the interests of the other with which the actor's conduct interferes,

    d) the interests sought to be advanced by the actor,

    e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

    f) the proximity or remoteness of the actor's conduct to the interference, and

    g) the relations between the parties.

*Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1196 (Colo. App. 2009).

68.     Considering these factors and the record before it, this Court concludes that Interstate did not adduce a preponderance of the evidence to establish Zurich American engaged in improper interference.

69.     As an initial matter, the Hotel and Marriott International were free to agree to contractor rates above what is reimbursable under Marriott International's insurance. [Doc. 127 at 798:17–25].

70.     In addition, at no point in time did Marriott International believe Zurich American was telling it not to pay or otherwise induce it not to pay.  [Doc. 126 at 610:1–4].  This conclusion is also confirmed by the Court's review of the documentary evidence in this case.

71.     Indeed, it was Marriott International that directed Ms. Gomes to withhold payment until Zurich American paid, not the other way around.  [Tr. Ex. 111 at 6].

72.     Therefore, this Court finds no liability for tortious interference by Zurich American.  *See Warne*, 373 P.3d at 595; *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 623 (10th Cir. 1995) ("Defendant's conduct was not 'improper' for purposes of a claim for intentional interference in prospective economic advantage, and plaintiff's claim must fail."); *W.O. Brisben Cos. v. Krystkowiak*, 66 P.3d 133, 137–38 (Colo. App. 2002) (dismissing claim for tortious interference with contract where "[the plaintiff] did not allege that [the defendant] 'improperly' interfered with the contract"), *aff'd on other grounds*, 90 P.3d 859 (Colo. 2004).

### CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)     Plaintiff Interstate Restoration, LLC, is entitled to judgment in its favor on its claim for breach of contract against Defendant Marriott International, Inc., and is therefore entitled to damages in the amount of $2,668,155.39;

(2)     Defendant Zurich American Insurance Co. is entitled to judgment in its favor on Plaintiff Interstate Restoration, LLC's claim for intentional interference with contract;

(3)     The principal owed is properly subject to 2% monthly pre-judgment interest, which accrued on or about September 30, 2020;

(4)     Plaintiff Interstate Restoration, LLC, is entitled to post-judgment interest as calculated pursuant to 28 U.S.C. § 1961, accruing from the date of entry of judgment;

(5)     Plaintiff Interstate Restoration, LLC, is entitled to its reasonable attorney's fees; and

(6)     As the prevailing parties, Plaintiff Interstate Restoration, LLC, and Defendant Zurich American Insurance Co. are each entitled to their respective costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.


DATED:  March 5, 2024                    BY THE COURT:

                                         _____
                                         Nina Y. Wang
                                         United States District Judge